IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 647 |
| v. | ) | |
| | ) | Judge Ronald A. Guzman |
| DARRICK BOROCZK | ) | |

**NOTICE OF FILING**

To:     JEFF PERCONTE               TRACY PHILLABAUM
          Assistant United State Attorney     U.S. Probation Officer
          219 South Dearborn, 5th Floor      55 E. Monroe, 15th Floor
          Chicago, IL 60604               Chicago, IL 60603

Please take notice that on July 27, 2011, the undersigned filed the following document(s) in the above captioned cause, a copy of which is attached hereto:

**DEFENDANT BOROCZK'S SENTENCING MEMORANDUM
and REQUEST FOR MANDATORY MINIMUM SENTENCE**

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Carol A. Brook,
Executive Director

By:    */s/ Helen Kim Skinner*

55 E. Monroe, Suite 2800
Chicago, IL 60603
(312) 621-8344

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 647 |
| v. | ) | |
| | ) | Judge Ronald A. Guzman |
| DARRICK BOROCZK | ) | |

## DEFENDANT BOROCZK'S SENTENCING MEMORANDUM and REQUEST FOR MANDATORY MINIMUM SENTENCE

Defendant DARRICK BOROCZK, by the Federal Defender Program and its attorney, HELEN KIM SKINNER, respectfully submits this sentencing memorandum, pursuant to 18 U.S.C. § 3553(a), in support of his request for a mandatory minimum sentence of fifteen years, or 180 months in prison. Fifteen years in prison is still an extraordinarily long amount of time for any person to be away from society. Fifteen years is a sentence justified under 18 U.S.C. § 3553(a), especially in light of Mr. Boroczk's post-crime remorse and efforts at rehabilitation, as well as the fact that we have evidence that he is not an individual who will recidivate when he is released from prison. Nevertheless, because fifteen years is the mandatory term of punishment set forth by Congress, it is also the lowest sentence that Mr. Boroczk can receive from this Court. In further support of our specific sentencing request, we state the following:

## I. The History of Darrick Boroczk

Darrick Boroczk is the 34-year-old son to Eugene and Sandra Boroczk and brother to five siblings – three of whom are older than him, and two of whom are 13-year-old twins. PSR at 16-

17. His early childhood was spent without his biological father's involvement in his life. Specifically, as Mr. Boroczk relayed to the Probation Officer, when he was first born, it was his mother and he; his father was said to be struggling with alcoholism. Although they received much help from his maternal grandmother, Mr. Boroczk lived in more than five homes between the ages of birth to twelve. Sometimes he and his mother lived alone; other times, they tried sharing space with various relatives including those from his mother's and father's side. Mr. Boroczk describes fingernail marks that were inflicted on him by an aunt when he was young. PSR at 17. He also describes how, for a time, he and his mother also lived with Richard Cracco, between the ages of five to eleven; Mr. Boroczk's mother and Mr. Cracco divorced in 1983. Mr. Cracco drank daily and Mr. Boroczk did not get along with Mr. Cracco's children. *Id.*

By the time he was 6-years-old, Mr. Boroczk had begun seeing a therapist. Described by his mother as a helpful, sensitive and "easy-going" child, his mother was worried about Darrick's presentation as a quiet and withdrawn child. PSR at 17. Mr. Boroczk states that he never felt as if he had any friends throughout grade school or junior high school. He thought he was seeing a counselor to work on self-esteem issues. In 1988, when Mr. Boroczk was in junior high, his mother and father reunited. PSR at 17. Although his mother initially reached out to Eugene Boroczk in pursuit of child support on behalf of Darrick, they unexpectedly rekindled their relationship. At the time, Gene Boroczk was living in Tennessee. Because Mr. Boroczk and his father had not had much contact during those years in between, there was an obvious adjustment period for everyone when Gene Boroczk moved back to Chicago. PSR at 17.

Nevertheless, at no time was Mr. Boroczk a behaviorally difficult child. *See* Exhibit A, Science Fair Picture and Earned Certificates. Instead, his father describes how Darrick always

2

did what was expected of him around the house, and he was given normal chores, which included tasks such as taking out the garbage, cutting the lawn and raking leaves. *See* Exhibit B, Letter from Eugene Boroczk. Gene Boroczk says his son would always help with whatever was asked of him without complaining. He was on the golf team his freshman year of high school, and he especially enjoyed his experiences at the Aviation & Space Academy he attended in Alabama during his freshman and sophomore year of high school. *See* Exhibit C, Aviation Camp Pictures.

As a teenager, Darrick Boroczk preferred to watch television or play video games rather than be out socializing. He tended to find it easier to befriend those who were more likely classified as "outcasts," rather than anyone who was popular, athletic or mainstream. Still, though, he had a fairly typical and normal adolescence, working part-time at Office Depot to earn some extra money to spend on small items of his own choosing. He was able to graduate from Oak Lawn Community High School in 1995, and during that time in his life, everything at home was fine. PSR at 20. After graduation from high school, Mr. Boroczk attended Moraine Valley Community College for one year. PSR at 20-21; *see also* Exhibit D, Service Excellence Recognition Award.

He dated throughout his junior and senior year in high school, but he began dating his wife, Candice (Candy), more seriously, shortly after his graduation from high school. After being together for about one year, on and off, Mr. Boroczk moved on to another relationship with a young woman named Jennifer, and that relationship lasted approximately two years. Mr. Boroczk and Candy began dating again shortly after he stopped dating Jennifer. Very quickly, however, Candy became pregnant with the first of their five children; they had their eldest son, K.B.1, who is now 10-years-old, in March 2000.

3

At that time, Mr. Boroczk was still young. He was 22-years-old and recently employed on a part-time basis at Cardinal Healthcare, in Waukegan, Illinois. Mr. Boroczk was an Inventory Control Analyst who assembled hardware orders and provided customer service. This soon became a full-time position, where he was working approximately 45 to 50 hours a week. *See* Exhibit E, Darrick Boroczk Résumé. By November 2000, he and Candy got married. PSR at 18. Although they lived temporarily with his parents, by 2001, they were happy to be able to move into their own small apartment in LaGrange, Illinois. Mr. Boroczk worked extremely hard and diligently to support his family. They had their second child and eldest daughter, S.B., in July 2003. In 2005, after his department at Cardinal dissolved, Mr. Boroczk went to Baxter Global Technologies as a Warehouse Specialist. PSR at 21. He was repeatedly praised by customers who worked with him at both companies. *See* Exhibit F, Letters of Appreciation. Mr. Boroczk stayed at Baxter from his start date in July 2005, until his resignation in July 2009. KB2, their second son, was born in 2006. With three children, the family was in desperate need of a bigger apartment. By May 2007, Mr. Boroczk was proud to be able to say that he was a first-time home owner. Candy also became pregnant with their fourth child, due in June 2009.

## II.     The crime that Mr. Boroczk committed.

At the time that Mr. Boroczk committed the crime for which he is now being sentenced, he had been working at Baxter for years, and his work hours were anywhere from nine to twelve hours a day. During that time, his relationship with his wife was "not that great." PSR at 18. His wife was suffering from depression; she was always tired, in pain, or just not feeling well, in general. When he came home, he would often find the house in disarray. They were having

4

many marital difficulties, on a daily basis, and could not seem to agree on anything, ranging from financial issues to parenting techniques. They were constantly arguing.

In the meantime, however, Mr. Boroczk did not have any friends or social outlets. The times he would opt to spend with his parents often resulted in an argument with Candy as soon as he returned home. He began spending more and more time on the Internet, a service which they obtained in their home in 2004. He soon began looking at adult pornography, but he also began to form computer relationships through his on-line conversations with individuals he grew to believe were his "friends." The availability of high-speed Internet, which allowed him to access volumes of data and images in a short amount of time, resulted in Mr. Boroczk's download of hundreds of adult pornography pictures. By 2006, he was looking for and downloading pornography on daily basis. But, at this point, Mr. Boroczk's consumption of adult pornography was not criminal or even uncommon. Americans spend an estimated $12 billion a year on adult entertainment, and pornography revenue in the United States is nearly double the combined revenue for the three major television networks ABC, CBS, and NBC, which is just over $6 billion.[1] The rise of the Internet, and other forms of digital media sharing, has facilitated around-the-clock access to pornography. Unlike ever before, consumers can purchase, download, and exchange adult pornography without ever leaving home.

For this reason and others, Dr. Al Cooper, a psychologist who wrote about on-line sexual behavior, described on-line access and the development of relationships through that particular

---

[1] *See Brigham Young University National Statistics on Pornography*, http://wsr.byu.edu/content/national-pornography-statistics.

medium as the "crack cocaine" of sexual compulsivity.[2] Unhealthy relationships can easily become the substitute for healthy ones. Indeed, as Mary Anne Leyden, Ph.D., a psychologist at the University of Pennsylvania has stated, the same criteria used to diagnose problems like pathological gambling and substance abuse can be applied to problematic porn use. "The therapists who treat pornography addicts say they behave just like any other addicts."[3] One of the key features of addiction is the development of a tolerance to the addictive substance. In the way that drug addicts need increasingly larger doses to get high, porn addicts need to see more and more extreme material to feel the same level of excitement they first experienced. This matches the statements of Dr. Patrick Carnes, Director of Sexual Disorders Services at Arizona's Meadows Treatment Center. Dr. Carnes states that excessive use of online porn can be thought of as a manifestation of both Internet addiction and sex addiction. Porn addiction develops much like drug addiction, but Internet porn addiction can bring about a different psychological toll than shame alone because as tolerance grows individuals with porn addiction may need more deviant material to achieve the same "high." Exposure to such material can grossly distort beliefs about human sexuality and ruin interpersonal relationships. Social norms tell the sex-addict that there is shame in buying an adult magazine or soliciting a prostitute, yet Internet porn substantially reduces the risk of getting caught, i.e. being shamed. Many individuals who experience porn addiction are able to hide their activity from their partners and remain completely anonymous on the Internet. Yet online porn is available all the time, and as he states, "When you add complete

---

[2] *See* Cooper, Al., *Cybersex: The Dark Side of the Force : a Special Issue of the Journal Sexual Addiction & Compulsivity*, Psychology Press (2000).

[3] Dr. Leyden spoke to Web MD and also testified as a witness at the Sentencing Hearing on pornography addiction.

6

anonymity to the mix, it is a recipe for a potentially serious addiction."[4]

Victor B. Cline, Ph.D., at the University of California, Berkeley, who authored *Where Do You Draw the Line? Explorations in Media Violence, Pornography, and Censorship*, wrote of the various phases, or steps, that occur before someone becomes an addict, sex offender or someone with a sexual illness. Specifically, he describes how the first step, "Addiction," is marked by dependence to pornographic materials despite negative consequences, yet many of his "most intelligent male patients appeared most vulnerable, perhaps because they had a greater capacity to fantasize, which heightened the intensity of the experience and made them more susceptible to being conditioned into an addiction." The second step, "Escalation," comes with the passage of time, and it requires more explicit, more deviant kinds of sexual material to get their "high" or "sexual turn-on," reminiscent of individuals with drug addictions. The third step, "Desensitization," is when materials in books, magazines, films, videos originally perceived as shocking, taboo-breaking, illegal, repulsive, or immoral, in time came to be seen as acceptable and commonplace and the sexual activity depicted in the pornography became legitimized even though the activity was contrary to their previous moral beliefs and personal standards. Finally, the fourth step, "Acting Out Sexually," includes an increased tendency to act out sexually the

---

[4] Sister Weber, an American Board of Psychiatry and neurology-certified physician, is also widely published on the psychological impact of pornography and other addictions. She stated, "Addictions are often accompanied by feelings of restlessness, depression, loneliness, and low self-worth. Pornography can be an easy fix because it can mask distressing thoughts. It may seem a pleasure-seeking behavior, but it really stems from a need to suppress or avoid emotional pain." She also said, "Computer-enabled fantasies are highly reinforcing. The association of the Internet with sexual arousal can be so potent that going on the Internet for any reason triggers it. The habit develops into a compulsion." At this stage, said Sister Weber, users don't even care they are jeopardizing careers or relationships. "This online fantasy life produces an altered state of consciousness associated with tension reduction and relieved feelings of guilt, anxiety and depression."

behaviors viewed in the pornography, and the behavior frequently grew into a sexual addition which the person found himself locked into and unable to change or reverse, no matter what the negative consequences were in their life. As Dr. Cline stated, "The best evidence to date suggests that most or all sexual deviations are learned behaviors, usually through inadvertent or accidental condition." He further said, "It makes no difference if one is an eminent physician, attorney, minister, athlete, corporate executive, college president, unskilled laborer, or an average 15-year-old boy. All can be conditioned into deviancy."[5]

We cite to these experts and excerpts on pornography addiction to emphasize the reality that Mr. Boroczk's childhood and life reveal him to be a "normal guy" until this time. He had a relatively unremarkable childhood; he had an average life. He could easily be described by many to be a good son, husband, father, or employee, but especially important, he lacked any apparent sociopathology or proclivity to child pornography. He was not someone who was set to become a child molester. Instead, he was someone who went through the exact phases and journey described in the literature. He grew increasingly dependent and addicted to pornography on the Internet over time. But as he slowly found adult pornography to be a source of excitement and deviancy, he became more and more desensitized to that which could be viewed as "mainstream"

---

[5] *Available at*
http://mentalhealthlibrary.info/library/porn/pornlds/pornldsauthor/links/victorcline/porneffect.ht
m. We further note that The Witherspoon Institute also released a fifty-three page report entitled
*"The Social Costs or Pornography: A Statement of Findings and Recommendations,"* in 2010,
signed by more than fifty scholars from various professions, academic disciplines and political
ideologies, in which it similarly describes how early and repeated exposure and indulgence in
pornography leads to the four phases of addiction, i.e. addiction, escalation, desensitization, and
acting-out so that acts of sexual deviancy that may include promiscuity, group sex, rape,
sadomasochism, child molestation, and extramarital affairs can occur for otherwise "normal"
men, women and children.

material. Other individuals, in turn, exposed him to more and more deviant images, which eventually included images of child pornography.

As he says in his letter to the Court, Mr. Boroczk did not start with any preconceived notions of what would happen if he were to start using the Internet. He was simply drawn to the people with whom he felt he could develop a friendship. *See* Exhibit G, Letter from Darrick Boroczk. Mr. Boroczk is honest when he writes of his initial reaction to some of the material – he found the child pornography material to be "horrible." Yet in line with expert statements above, all sexual deviations are learned behaviors. He was literally conditioned into deviancy, and he gradually developed an appetite for child pornography, whether it can be excused or not. As the the Department of Justice Office of Community Oriented Policing Services report, entitled "Child Pornography on the Internet," states:

> Sexual attraction to children is known as pedophilia. However, an interest in Internet child pornography may be best thought of as falling along a continuum rather than in terms of a hard and fast distinction between pedophiles and non-pedophiles. People can behave very differently on the Internet than they do in other areas of their lives. Interacting anonymously with a computer in the safety of one's own home encourages people to express hidden thoughts and desires. Offenders vary in the strength of their interest in child pornography, as well as in the level of severity of the pornographic image to which they are attracted.[6]

## III.    Darrick Boroczk's Specific Request for a Non-Guidelines' Sentence

Mr. Boroczk now submits that a sentence at the mandatory minimum term of fifteen years, established by Congress for his crime under Title 18 U.S.C. § 2252A(a)(1) and (a)(2)(A),

---

[6] Wortley, Richard and Stephen Smallbone, *available at* www.popcenter.org/problems/child_pornography/, at 13 and 14.

would fulfill all of the sentencing purposes of 18 U.S.C. § 3553(a) far better than any sentence that is now being suggested by the Guidelines. As this Court knows, Mr. Boroczk pleaded guilty to all of the counts charged in his indictment. Although receipt, possession, distribution, and production of child pornography are certainly extremely serious and even shocking crimes, Mr. Boroczk's life history and his true potential for rehabilitation must be recognized and reflected in his ultimate sentence. The specific sentence of fifteen or even twenty years in prison would be a sufficient, but not greater than necessary sentence, in this particular case and in light of this particular defendant's history.

### A.      This Court Has Full Discretion to Issue a Non-Guidelines Sentence

To begin, we start with the premise that in *United States v. Booker,* 543 U.S. 220, 226-27 (2005), the mandatory nature of the sentencing guideline system was found to be in violation of the Sixth Amendment of the U.S. Constitution. The Supreme Court made the sentencing guidelines advisory, only. *Id.* at 245. Since then, other Supreme Court decisions have clarified the Supreme Court's intentions. In *Gall v. United States*, 128 S. Ct. 586, 602 (2007), *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007), *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007), and *Cunningham v. California*, 127 S. Ct. 856, 867 (2007), the Supreme Court has made clear, time and time again, that district courts should issue sentences upon a defendant according to the facts and applicable law of the case before them.

The Supreme Court has repeatedly said the guidelines are but one of the considerations, but the "overarching provision instruct[s] district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing. . . ." *See Kimbrough*, 128 S. Ct. at 570 (quoting 18 U.S.C. § 3553(a)). As the Court said in *Gall*, sentencing courts "may not

10

presume that the Guideline range is reasonable;" rather, they must "make an individualized

assessment based on the facts presented" to arrive at a sentence that is sufficient but not greater

than necessary in each given case. *Gall*, 128 S. Ct. at 597. There is no compelling reason to

issue anything more than the fifteen year sentence we request. The Guidelines recommend a

sentence of life in prison for Mr. Boroczk. That sentence is completely wrong.

> **B. The Guidelines' Recommendation for Life is not tied to any empirical evidence or data, and post-*Booker*, district court judges throughout the country are recognizing that the advice of the Guidelines in child pornography cases are too high and unreliable.**

The Supreme Court has previously said that the Sentencing Commission's role typically

includes reliance on empirical evidence, along with a thorough review and revisions to the

Guidelines, in light of judicial decisions, sentencing data, and comments from participants and

experts in the field. *Rita*, 127 S. Ct. at 2464-65. Thus, when the Commission departs from its

normal practices, a less reliable appraisal of that which is "a fair sentence" may result.

*Kimbrough*, 128 S. Ct. at 574-75. The amount of respect, or deference, given to a particular

guideline section or resulting range, therefore, depends on whether or not the Commission acted

in "the exercise of its characteristic institutional role." Many courts around the country have

found that the *Kimbrough* analysis is applicable to every section of the guidelines, including the

child pornography section now being applied to Mr. Borozck's case. *United States v.*

*Kimbrough*, 552 U.S. 85, 110 (2007); *see also*, John G. Woodlee, *Congressional Manipulation*

*of the Sentencing Guideline for Child Pornography Possession: An Argument for or Against*

*Deference?*, 60 Duke L.J. 1015, 1026 (history of amendments to guidelines reveal congressional

11

preferences that overshadowed Commission's empirical analysis).[7]

Importantly, district and appellate courts around the country have more recently been asked to consider a rejection of the guidelines involving child pornography because the child pornography guidelines have been driven by Congressional directives rather than being the product of empirical data, research or studies. Put differently, at the heart of our request for consideration of whether the child pornography guidelines are fair, is the indisputable fact that the child pornography guidelines have grown exponentially more harsh and severe over the years because of a steady stream of Congressional mandates to the Sentencing Commission – despite the Commission's opposition to these changes.[8] That is, rather than being the Sentencing Commission's own, independent view of what would be a fair, just sentence, the pornography guidelines are undeniably lacking the testament of being a cohesive product of empirical inquiry. For this reason, other sentencing courts around the country have found that the child pornography

---

[7] *See United States v. Vanvliet*, 542 F.3d 259, 271 (1st Cir. 2008) (*Kimbrough* permits disagreement with use-of-computer enhancement); *United States v. Tankersley*, 537 F.3d 1100, 1112 (9th Cir. 2008) (*Kimbrough* analysis is applicable to all guidelines); *United States v. Jones*, 531 F.3d 163, 172-73 (2d Cir. 2008) (*Kimbrough* analysis is applicable to all guidelines); *United States v. Smart*, 518 F.3d 800, 808-09 (10th Cir. 2008) (*Kimbrough* analysis is applicable to all guidelines).

[8] *See* Troy Sabenow, Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines, *available at* http://sentencing.typepad.com (June 10, 2008), at 4, 7-12. Also, however, the U.S. Department of Justice wrote a report in which it, too, noted that median prison terms for convicted sex offenders more than doubled between the time period of 1996 to 2006, and the increase in a typical sentence imposed on sex offenders between the time period of 1995 and 2007 is nearly 300%. *See, also*, Lynn Adelman and Jon Dietrich, *Symposium Article: Improving the Guidelines Through Critical Evaluation: An Important New Role for District Courts*, 57 Drake L. Rev. 575, 584 (2009).

guidelines were seriously flawed.[9]

Additionally, in *United States v. Dorevee*, 616 F.3d 174 (2d Cir. 2010), *reh'g en banc denied* (2d Cir. August 31, 2010), the Second Circuit encouraged judges to exercise their discretion to impose below-guideline sentences in child pornography cases because the various enhancements in § 2G2.2 operated to concentrate offenders at the top of the sentencing spectrum in a manner "fundamentally incompatible with § 3553(a)." Also, in *United States v. Grober*, 624 F.3d 592 (3d Cir. 2010), the Third Circuit affirmed a district court decision that expressed similar concerns. In that case, after extensive consideration of § 2G2.2, the district court had found that the guidelines were flawed, especially because the enhancements applied for use of a computer, depictions of prepubescent minors and sadistic or masochistic conduct, distribution, and based on the number of images, all amplified the level of severity of the offense in a manner resulting in

---

[9] *See, e.g., United States v. Shipley*, 560 F. Supp. 2d 739 (S.D. Iowa 2008) (child pornography), *United States v. Rausch*, 570 F. Supp. 2d 1295 (D. Colo. 2008) (child pornography), *United States v. Hanson*, 561 F. Supp. 2d 1004 (E.D. Wis. 2008) (Judge Adelman stated, " . . . this increase was not the result of the empirical approach often used by the Commission, designed to be an expert body on sentencing . . . it was the result of arbitrary increases by Congress slipped into other bills, often with little or no debate, resulting in direct amendments to the guidelines."); *United States v. Ontiveros*, 2008 WL 2937539 (E.D. Wis. July 24, 2008) (child pornography), *United States v. Taylor*, 2008 WL 2332314 (S.D.N.Y. June 2, 2008) (child pornography); *United States v. Johnson*, 07CR127 (S. Dist. IA, Dec. 3, 2008) (Chief Judge Robert Pratt wrote that he Court was "unable to locate any particular rationale for [more severe penalties] beyond the general revulsion that is associated with child exploitation-related offenses." He also cited to the amendments over the years, as well as Troy Stabenow's report); *United States v. McClelland*, 2008 WL 1808364 (D. Kan. April 21, 2008) (child pornography); and *United States v. Baird*, 208 WL 151258, at *7 (D. Neb. Jan. 11, 2008) (Chief Judge Bataillon stated the guidelines for child exploitation offenses were not developed with an empirical approach by the Sentencing Commission; rather, they were promulgated primarily in response to statutory directives.)

an inflated guideline sentence. *Id.* at 597.[10]  The Third Circuit noted, in its opinion, how

"numerous district courts across the country similarly found § 2G2.2 flawed, *see, e.g., United*

*States v. Diaz,* 720 F.Supp. 2d 1039 (E.D. Wis 2010) (collecting cases); *United States v. Riley,*

655 F. Supp. 2d 1298 (S.D. Fla. 2009); *United States v. McElheney,* 630 F. Supp. 2d 886 (E.D.

Tenn. 2009); *United States v. Beiermann,* 599 F. Supp. 2d 1087 (N.D. Iowa 2009); *United States*

*v. Phinney,* 599 F. Supp. 2d 1037 (E.D. Wis. 2009). . . . Also supporting the District Court's

conclusions is, among other reports, the recently issued Sentencing Commission's Report on the

history of the child pornography Guidelines,[11] an extensive and extraordinarily thorough study,

indeed." *Id.* at 603-04.

   Separately, a study by the Sentencing Commission found that the imposition of non-

guideline sentences in child pornography cases increased from an average of 22% of the time in

2006, to 27.2% in 2007, then 39% in 2008.  *See* U.S.S.C., *Preliminary Post-Kimbrough/Gall*

*Data Report,* tbl. 4 (Sept. 2008).  The Sentencing Commission's data demonstrates that the

actual percentage of cases in each circuit with variance rates in child pornography cases between

---

   [10] Much of this conduct is present in most similar offenses, including Mr. Boroczk's.  For
example, as of 2009, many of these enhancements applied in over 90% of cases, with sadistic or
masochistic conduct occurring in over 70% of the cases.  *United States v. Tapp,* 2010 U.S.
Dist. LEXIS 115051, *14-15; *see also United States v. Diaz,* 720 F. Supp. 2d 1039, 1042 (E.D.
Wis. 2010) (enhancement for images of pre-pubescent minors applicable in 94.8% of cases;
enhancement for images of sadistic of violent conduct applicable in 73.4% of cases;
enhancement for use of a computer applicable in 97.2% of cases; enhancement for number of
images applicable in 96.6% of cases, with 63.1% of defendants qualifying for an enhancement
for more than 600 images).

   [11] *See* United States Sentencing Commission, The History of the Child Pornography
Guidelines (Oct. 2009), *available at*
http://www.ussc.gov/general/20091030_History_Child_Pornography_Guidelines.pdf.

2007-2009 is an extremely real phenomenon, but more importantly, the average national rate of deviation from the Guidelines went as high as 40% in 2009, with the average sentence imposed in the Seventh Circuit reduced by 30.6% from the Guidelines at a median term of 100 months. *See* Exhibit H, Excerpt from the United States Sentencing Commission Data File.[12]  This means that since *Booker*, below-range sentences in § 2G2.2 cases have been consistently and steadily increasing.  Additionally, however, recent results from a 2010 survey of district judges by the Sentencing Commission revealed that 70% of the respondents believed that the sentences recommended by the guidelines for child pornography defendants was too high despite finding the sentences recommended for other types of offenses (except crack cocaine offenses) to be "generally appropriate."[13]

Although we recognize that this Court is not required to consider an argument that a guideline is unworthy of application in any case because it was promulgated without adequate deliberation, the Seventh Circuit has stated that this Court is free to reject a guideline if it is inconsistent with its own penal theories, and/or if it believes the guideline is lacking in data, experience or expertise. *United States v. Aguilar-Huerta*, 576 F.3d 365 (7th Cir. 2009).  We urge this Court to see that the present Guidelines are far from useful if this Court is truly striving to find the minimally sufficient sentence for Mr. Boroczk as required under 18 U.S.C. § 3553(a). Put differently, the Guidelines produce an unsound sentence in the particular circumstances of this case, and this Court must ensure that any sentence reflects the § 3553(a) factors – it should

---

[12] By comparison, in the D.C. Circuit, 1st Circuit and 2nd Circuit, reductions were given in 46%, 47% and 51% of the cases, respectively.

[13] *Available at* http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf

15

not simply base Mr. Boroczk's sentence on the Guidelines, which lack any empirical base. This Court can certainly consider any flaws of the child pornography guidelines in determining the right sentence in this particular case, and we ask it to do so in accordance with § 3553(a).

### C. Mr. Boroczk's Counseling with Dr. Morgan show him to be an individual with extraordinary remorse and an individual who has made great rehabilitative efforts to correct his deficiencies.

Mr. Boroczk is an individual who has shown extraordinary remorse for his behaviors and his crimes, and certainly, his post-crime attitudes and efforts to obtain treatment for his behaviors should be taken into account under 18 U.S.C. § 3553(a) as they tie to his personal characteristics, need for deterrence and future dangerousness. Specifically, beginning in October 2009, Mr. Boroczk began weekly phone counseling with Dr. Mickey Morgan, a licensed clinical psychologist who has over twenty years experience. He did this because he wanted to learn more about himself and understand why he committed this crime. Although Mr. Boroczk knew that he would be facing a minimum incarceration term of fifteen years, and he would separately likely be ordered to undergo sex offender treatment while he is in the Bureau of Prisons, he wanted to obtain the immediate counseling. He did not want to wait until post-sentencing. He had no incentive to do this other than to improve himself, knowing full-well that he would be facing an extraordinary amount of time in prison regardless of any post-offense efforts.[14]

Dr. Morgan wrote extensively about his ongoing counseling with Mr. Boroczk that lasted approximately six months. *See* Exhibit I, Clinical Progress Report by Mickey Morgan, Psy.D. (12/1/10) and Letter (7/21/11) (Under Seal). In particular, Dr. Morgan detailed Mr. Boroczk's

---

[14] He actually began counseling with Dr. Morgan without consulting with his defense attorney first, further demonstrating that it was not orchestrated nor an attempt to minimize any of his responsibility for his crimes.

16

challenges and growth over the course of therapy, especially stating that initially, Mr. Boroczk

"struggled for awhile . . . demonstrating levels of remorse consistent with the severity of his

crime." *Id.* at 2. As Dr. Morgan stated, "It was a slow and painful process for Darrick to let go

of [his] destructive rationales. It meant he had to acknowledge the true severity of the crime

concerning the actual harm he had inflicted on his own children, as well as countless images of

indirect victims he had collected and traded. This was the most difficult hurdle regarding

Darrick's preliminary treatment process." *Id.* at 3. Yet as Dr. Morgan explained:

> [H]is judgment appeared to have been slightly impaired leading directly to
> denying harm and committing his crime. He knew it was morally and legally
> wrong, but was desensitized and unable to control his urges. Darrick and I spent
> a significant amount of time in treatment breaking through this destructive
> defense mechanism used to deny harm. It was obvious that Darrick wasn't
> trying to manipulate or intentionally avoid responsibility.

*Id.* He continued, "[But] In the recent months, he has been genuinely remorseful with many

tearful verbalizations as he began accepting at the deepest levels the true harm he has caused."

*Id.* Ultimately, Dr. Morgan wrote, "Darrick continues to take full responsibility for his actions,

with significantly improved awareness and insight regarding the harm he has caused, and a strong

determination to never re-offend." *Id.* at 3. "His overall sincerity and motivation in treatment

has been exceptional. He's encountered some difficult challenges along the way, but has always

maintained strong levels of sincerity and determination to learn and grow." *Id.* at 2.

Indeed, we see, through Dr. Morgan's report, that Mr. Boroczk's efforts to understand

what he did, what it meant for him and his family, and how to "fix" any of his deficient thinking

was something that he needed to address consistently and diligently during his counseling

sessions with Dr. Morgan – which were all voluntary. Dr. Morgan's December 2010 letter to the

Court states, "Clinical prognosis for successful long-term rehabilitation is excellent with continued sincere efforts in treatment." *Id.* He wrote of his continued four months of treatment with Mr. Boroczk, stating, at the end,"It is my clinical impression that Darrick's specific type of Internet originated pedophilia addiction is one of the most treatable, as long as treatment efforts continue to be sincere and consistent, and tends to have a significantly better prognosis to not re-offend." Moreover, "Darrick has continued to take full responsibility for his actions. His determination to learn everything possible to never re-offend appears genuine and consistent. . . . Clinical prognosis for successful long-term rehabilitation continues to be excellent."

### D.  Darrick Boroczk was Evaluated by Dr. Fogel and He was Found to Be an Individual with a Low Likelihood of Recidivism.

Separately, we submit to the Court an evaluation that was written by Michael Fogel, Psy.D., a licensed clinical psychologist and expert who is Board Certified in Forensic Psychology and a member of the Board of Directors for the American Board of Forensic Psychology (ABFP). *See* Exhibit J, Forensic Psychological Evaluation by Michael Fogel, Psy.D., ABPP (Forensic) (Under Seal). Dr. Fogel is an expert who has worked in the field of psychology since 1994, and he has specialized in the field of mental health evaluations in the context of criminal responsibility for over twelve years. He has performed hundreds of evaluations of sex offenders in the criminal justice system. *See* Exhibit K, Michael Fogel, Psy.D., ABPP, Curriculum Vitae. He was retained by the Federal Defender Program in order to determine Mr. Boroczk's psychiatric condition, and he was asked to make any treatment recommendations, if possible, for this Court to be used at the time of sentencing. His report is slightly over twenty-one pages, but within it, he includes a long list of documents, tests and interviews that form the basis for his

18

opinion. *Id.* at 1-2. Importantly, Dr. Fogel's ultimate opinion is also that Darrick Boroczk's risk

to commit a future hands-on sexual offense is low.

Specifically, as Dr. Fogel notes, Mr. Boroczk was open and honest in his answers. *Id.* at

5-6, 9-15. Mr. Boroczk "appears to be a reliable historian." *Id.* at 16. In particular, Mr. Boroczk

made many statements against his own interest, and he gave extensive explanation when

explaining his thoughts, behaviors and overall involvement in this case. Dr. Fogel stated:

> Although he presents with several risk factors that are dynamic and therefore
> amenable to treatment (i.e., sexual preoccupation, deviant sexual interest,
> offense-supportive attitudes, and intimacy deficits), it is my clinical opinion
> that these factors do not exacerbate his risk such that he presents a high risk to
> commit a future hands-on sexual offense. Rather, it is my clinical opinion that
> the totality of data suggests that his risk to commit a future hands-on sexual
> offense is low. In fact, research shows that incest offenders recidivate at a
> significantly lower rate than offenders who target individuals outside the family,
> with the highest rates observed among the extrafamilial boy-victim child
> molesters . . . and the lowest rates observed among the incest offenders . . . .
> Moreover, Mr. Borozck's risk will be further controlled by the likely extended
> period of supervised release that will follow his period of confinement.

*Id.* at 21. Dr. Fogel came to the following conclusions about Mr. Boroczk: "Empirically-based

risk factors that do not apply to Mr. Boroczk include prior criminal history, prior sexual

offending, resistance to rules and supervision, employment instability, having never been

married, and stranger or unrelated victims." *Id.* at 21-21. He continued: "Moreover, it is notable

that there is no evidence by history or psychological testing to suggest that Mr. Boroczk struggles

with any major mental illness (e.g., Schizophrenia or Bipolar Disorder), personality disorder, or

prolonged substance abuse. Instead, he presents himself in a forthright manner, expressing a

willingness to be involved in psychotherapy and improve his lot in life. This bodes well for the

success of treatment as there are no other apparent barriers to a successful treatment outcome. *Id.*

He ultimately recommended specific sex offender treatment tailored to address Mr. Boroczk's addictive pattern of sexually-related behavior, rather than a general cognitive behavioral approach designed to treat "all sex offenders." *Id.*

Dr. Fogel noted Mr. Boroczk's "significant multi-generational family history of addiction." *Id.* He describes, very alike to the literature cited above, how Mr. Boroczk engaged in behaviors that he would not have ordinarily done, but for the "online disinhibition effect" that is caused by the anonymity of the Internet. *Id.* at 18-19. He clarified that just "one dimension" of Mr. Boroczk's thinking and behavior was revealed within this specific situational context, and it was not that his "true" personality was allowed, in effect, to be unleashed through the Internet. *Id.* at 19. Instead, Mr. Boroczk was under the subjective belief that his Internet friends were, indeed, friends. *Id.* He also had more likelihood of being influenced by these individuals as he tends to be a "socially inhibited" man who "assumes a passive stance with individuals who have stronger personalities." *Id.* at 20. "His 'friends' provided him with group affiliation and status, validated and reinforced his compulsive sexual behavior, and supplied him with emotional support." *Id.* Additionally, however, Dr. Fogel stated, "deindividuation," or any person's sense of identity or internalized moral restraints can be abandoned in support of a situational or group norm. *Id.* Dr. Fogel wrote:

> Anonymity, arousal, group cohesiveness, and group immersion contribute to deindividuation. These elements were readily available for Mr. Boroczk and may explain, in part, why he deviated from previously held beliefs, values, and morals. That is, his "friends" reinforced his illicit behavior by providing him with encouragement, acceptance, and group status, thus facilitating his rationalization and denial that he was not harming his children. Since his arrest, and through working with Dr. Morgan, it is apparent that he has gained greater clarity regarding his behavior and the impact that it has had, and will continue to have, on his children. His expression of profound sadness as he spoke about his

20

previous conduct with his children and the corresponding betrayal appeared genuine.

*Id.*

Mr. Boroczk's personality profile reflected no evidence of any psychotic thought content, nor did it demonstrate any kind of antisocial personality disorder. *Id.* at 21. Mr. Boroczk's letter to the Court shows how he openly admits his mistakes and shows his true remorse for the victims of his crimes; he is not an individual who demonstrates a fundamental deficit in forming empathy for others – a trait that has been shown by research to be a contraindication to treatment. He is neurologically different from someone with significant psychopathy. Simply put, he is not an individual who acts without regard for the feelings and rights of others. There is no evidence that he is an individual without rehabilitative potential. Rather, the evidence we have put forward shows Mr. Boroczk to be the opposite. He is somebody with tremendous rehabilitative potential. He feels pain, emotion, sadness, and depression, and he will be suffering during all the years he will be in prison. He will feel, every day, the hopelessness and helplessness of his existing state of separation from his family, friends and society. Moreover, two doctors have separately opined that Mr. Boroczk's likelihood of recidivism is low.

We believe Mr. Boroczk's efforts to change, his true remorse for his crime, as well as his ability to understand the deeper ramifications of his actions can further be seen in his individual letters written to each of his children, none of whom he has been able to see since the day of his arrest. Each letter represents Mr. Boroczk's true feelings of remorse, regret and responsibility for his actions. *See* Exhibit L, Darrick Boroczk's Letters to His Children (Under Seal). Another indicator of Mr. Boroczk's genuine efforts to change his behavior and thinking can be seen as he

21

has been taking full advantage of the institutional programs available at Ozaukee County Jail, including the Set Free Program that was completed in 2009, as well as a twelve-week course on addiction. He also, more recently, completed a Bible Correspondence Course in June 2011. *See* Exhibit M, Certificate from In Pursuit Ministries dated May 24, 2010, and Source of Light Schools Certificate.

Finally, a letter from Mr. Boroczk's mother, Sandy Boroczk, only further supports our argument that although Mr. Boroczk is not an individual who will reoffend when he is released from prison. *See* Exhibit N, Letter from Sandy Boroczk. In her letter, Mrs. Boroczk writes of the good characteristics of her son that she wishes this Court would consider. *Id.* at 1-3. She writes of the fact that she and Mr. Boroczk wish they knew of the dangers of pornography addiction as that knowledge could have potentially meant that he would have received help rather than cause pain to those who he did not intentionally mean to hurt through his addictions. Id. at 3-5. Others, too, speak of Mr. Boroczk's history and personal characteristics that show why he is someone worthy of consideration for a lesser sentence than that which is recommended under the Guidelines despite his horrible crime. *See* Exhibit O, Letters from Others. Included in those letters are two from Mr. Boroczk's younger brother and sister who miss him in their lives. All describe Mr. Boroczk as someone who is not only different from the person who committed these crimes, but also as a individual person who has the potential to change.

E. **The government's expert does not affect Dr. Fogel's ability to offer this Court his qualified opinion in this case.**

The government may try to dissuade this Court from accepting the evaluations presented by Mr. Boroczk in this Memorandum. It has already indicated that it plans to call a witness from

22

the Isaac Ray Forensic Group to testify at Mr. Boroczk's sentencing hearing. *See* Exhibit P, Letter to Jeffrey Perconte from Tracy Rogers, Ph.D. Quite simply, however, Dr. Rogers cannot dissipate the strength of Dr. Fogel's opinion nor his report as she never evaluated or examined Mr. Boroczk. Although she tries to minimize Dr. Fogel's conclusions, she does so without offering any useful opinions in contradiction about Mr. Boroczk at all.

For example, the government or its expert may broadly claim that the testing used by Dr. Fogel to evaluate Mr. Boroczk included non-objective tests in which Mr. Boroczk was asked to answer questions posed to him or her by the examiner. To partially rebut this claim, however, we note that the only few "objective" means of assessing pedophilic sexual interest includes polygraph testing – which has long been recognized as unreliable to be used in court – but there is also a testing technique called penile plethysmography, which is used to measure changes in penile arousal in response to certain visual, auditory or emotional stimulation.[15] In particular, penile plethysmorgraphy involves actual showing of child pornography to the individual being tested. Not only is it an older testing methodology, but it has been discredited. Specifically, in *United States v. Weber*, 451 F.3d 552, 562-53 (9th Cir. 2006), the Ninth Circuit found that while plethysmograph testing might have some use in the treatment and monitoring of sex offenders, it is "exceptionally intrusive in nature and duration." The *Weber* Court found that the procedure implicates a particularly significant liberty interest, and agreed with the First Circuit's decision in *Harrington v. Almy*, 977 F.2d 37, 44 (1st Cir. 1992), that there was a due process issue raised if

---

[15] *See* Coric, Vladimir, MD, Feuerstein, Seth, MD, et al., "Assessing Sex Offenders", *Journal of Psychiatry*, November 2005.

forced to submit to the testing. *Id.* at 563.[16] Separately, there is also the Abel Assessment for Sexual Interest, a test that includes both subjective and objective testing in the form of a questionnaire combined with a measurement of visual reaction time to 160 slides, but this too has been criticized and debated as unreliable and invalid. *See* Coric and Feuerstein, *supra*, at 27-28, footnotes 17-19.

Dr. Rogers also cites a study, known as the "Butner Study," claiming that the study shows an "empirical link between the possession of child pornography and contact offenses. . . ." *Id.* at 2. Importantly, however, Andres Hernandez, Psy.D., one of the two authors of the Butner Study, wrote a Position Paper in which he specifically stated, "Some individuals have misused the results of Hernandez (200) and Bourke and Hernandez (2009) to fuel the argument that the majority of CP offenders are indeed contact sexual offenders and, therefore, dangerous predators. This simply is not supported by the scientific evidence."[17] Hernandez further wrote, "While the findings reported in Bourke and Hernandez (2009) have received considerable attention, the conclusions articulated in the article are limited by the fact that subjects were volunteer participants. . . predominantly Caucasian . . . and well-educated . . . the degree to which the results of our study are generalizable to all CP offenders is unknown, and this important question

---

[16] It ultimately remanded the case to have a better evidentiary record by the district court judge who was ordering the testing in the to be used as a condition of supervision. *Id.* at 570. *But see also* Harlow, Michael MD, JD, Scott, Charles, MD, "Penile Plethysmography Testing for Convicted Sex Offenders," *Journal of American Academy of Psychiatry and Law*, Vol. 35, Num. 4, 2007 at 536, 37; Rule, Deborah, "Can We Identify the Sexual Predator by Use of Penile Plethysmography?", *available at* http://www.forensic-evidence.com/site/Behv_Evid/BeE00005_2.html.

[17] *Available at* http://www.iprc.unc.edu/G8/Hernandez_position_paper_Global_Symposium.pdf

will only be answered with additional scientific inquiry." *Id.* at 9. Dr. Rogers' use of and familiarity with the research from this study appears to be stale in light of Hernandez's own caution that this study is "misused."

Moreover, other courts have already commented upon the "distasteful and prohibited by law" inferences that are being made by the government or certain experts who use the Butner Study to wrongfully assert that a unique individual is a danger to the public. For example, in *United States v. Cambpell*, 738 F. Supp. 2d 960, 968 (Dist. NE, August 26, 2010), the district court questioned the "scientific validity of the research" within the study, stating that the authors were employed by the U.S. Marshals service and Psychology Services Department of the Federal Correctional Institution, Butner, North Carolina, but also "the findings of the article are cause for caution." Similarly, in *United States v. Johnson*, 588 F. Supp. 2d 997, 1006-07 (S D. Iowa, December 4, 2008), the district court rejected the Butner Study as a credible report, noting that the population in the study was "certainly skewed," but there were also other methodological flaws. Also, in *United States v. Phinney*, 599 F. Supp. 2d 1037, 2045 (E D. Wisc, February 20, 2009), the district court also found the Butner Study to be flawed.

**F.     Fifteen years is a more than sufficient sentence if the Court is concerned about possible recidivism or the future dangerousness of Mr. Boroczk.**

We believe this Court must consider the fact that a longer prison sentence will not meet any sentencing goal more effectively than would a shorter prison sentence for Mr. Boroczk. That is, no more time than fifteen years will "cure him," make him any more or less likely to recidivate, and there is absolutely no research nor evidence to support the notion that a longer

25

sentence in prison deters crime any better than one that is shorter.[18] To the contrary, research

shows that a higher sentence does *not* provide more deterrence.[19] Studies have also found that an

offender's age upon release is indicative of likelihood that he will reoffend.[20] Specifically, the

Bureau of Justice published an article, entitled "*Recidivism of Sex Offenders Released from

Prison in 1994* (Nov. 2003)," in which it states, "Recidivism studies typically find that the older

the prisoner when released, the lower the rate of recidivism." The Sentencing Commission has

similarly found that recidivism rates decline consistently as the individual's age increases.[21] In

fact, the Justice article found that the vast majority of sex offenders do not reoffend, and this

matches other literature that says the lowest re-arrest for sex crimes (i.e. 3.3%) belongs to the

oldest sex offenders 45-years-old or older.[22] The combination of these studies should easily

convince the Court that Mr. Boroczk's likelihood of recidivating will be significantly decreased

by the time he is released from prison, even if given a sentence of fifteen years. We also note

---

[18] *See, e.g.,* The Sentencing Project, *Incarceration and Crime: A Complex Relationship,* at 6-7 (2005), available at http://www.sentencingproject.org/pdfs/incarceration-crim.pdf

[19] *See, e.g.,* Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules, Finding and Using the Philosophy of the Federal Sentencing Guidelines,* 40 Am. Crim. L. Rev. 19, 61 n.192 (2003).

[20] *See* Patrick Lussier and Jay Healy, *Rediscovering Quetelet, Again: The "Aging" Offender and the Prediction of Reoffending in a Sample of Adult Sex Offenders,* Justice Quarterly (Dec. 2009).

[21] *See* "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,"*available at* http://www.ussc.gov/publicat/Recidivism_General.pdf, 11-12. According to this study, only 9.5% of offenders over 50 commit new crimes within two years of release. *Id.*; *see also United States v. Thomas,* 360 F.Supp. 2d 238, 243 (D. Mass. 2005).

[22] The percentage rearrested for another sex crime after their release was 6.1 percent of those ages 18-24, 5.5 percent of those ages 25-29, 5.8 percent of those ages 30-34, 6.1 percent of those ages 35-39, 5.6 percent of those ages 40-44 and 3.3 percent of those ages 45 or older.

that Mr. Boroczk is also an individual without substance abuse issues – another important factor that may reduce the likelihood of recidivism.

At the same time, a sentence more than fifteen years will work against "efficient" treatment, especially because most of the programs geared towards treating sex offenders are behavior modification programs where the true progress and measure of recovery can only be measured from the time that the individual is in the community. We know that Mr. Boroczk is not only open to treatment, but desires treatment. According to research on sex offenders and their rates of recidivism, treatment and supervision are the two best ways to ensure that an individual will not recidivate.[23] Treatment can lower sexual recidivism rates and those who go without treatment are more likely to re-offend upon their release.[24] Yet the best treatment found to date for these offenders is a cognitive-behavioral approach with a supervised community component where peer groups and educational classes are used, along with a variety of counseling theories, including skill-based training, modeling of pro-social behaviors/attitudes, and use of a non-punitive orientation.[25] The emphasis for sex offender specific treatment is on

---

[23] *See, e.g.* Hanson R.K. and Morton Bourgon, R.K., *Predictors of Sexual Recidivism: An Updated Meta-Analysis*, Public Safety and Emergency Preparedness Canada (2004); Harris and Hanson, *Sex Offender Recidivism: A Simple Question* (2004); Hanson, R.K. and Bussiere, M., *Predicting Relapse: A Meta-Analysis of Sex Offender Recidivism Studies*, Journal of Consulting and Clinical Psychology (1998); Berlin, Hunt, et. Al, *A Five Year Plus Follow Up Survey of Criminal Recidivism within a Treated Cohort of 406 Pedophiles, 111 Exhibitionists and 109 Sexual Aggressives*: Issues and Outcome (1991).

[24] Geffner, Robert, Crumpton Franey, Kristina, et al., *Adult Sexual Offenders: Current Issues and Future Directions*, Journal of Child Sexual Abuse, Vol. 12, No. 3/4, 2003, 1-16. Article states that sexual recidivism rates are 12.3% verses 16.8% for offenders who receive treatment. *Id.* at 11 (citations omitted).

[25] *See* http://www.sexoffender.com/sorecidivism.html, at 20; *see also* Association for the Treatment of Sexual Abusers, *Reducing Sexual Abuse Through Treatment and Intervention with*

"recovery," as a life long process of adaptation and change, similar to an alcohol or drug addicted person who learns through a relapse prevention model of therapy.[26]  In fact, the Center for Sex Offender Management states the most effective programs include the following traits: 1) skill-based training; 2) modeling of pro-social behaviors and attitudes; 3) a directive but non-punitive orientation; 4) a focus on modification of precursors to criminal behavior; and 5) a supervised community component."

Perhaps for this reason and others, District Court Judge Ruben Castillo has previously stated, "Supervised release can be a very effective tool to use at sentencing."[27]  Moreover, a report by the Pew Center on the States, entitled *"State of Recidivism: The Revolving Door of America's Prison,"* states, "Decades of research have produced ample evidence and professional consensus about which case management strategies most effectively reduce recidivism and improve public safety.  Effective community supervision begins with validated risk and needs assessments, the accurate categorization of offenders by their risk of reoffending and the development and implementation of case plans based on an individual's needs and risk of

_____

*Abusers,* (ATSA Position Paper, 1996), *available at* http://www.atsa.com/pptreatment.html.

[26] Losel, F., & Schmucker, M., *The Effectiveness of Treatment for Sexual Offenders: A Comprehensive Meta-Analysis.* 1 Journal of Experimental Criminology, 117 (2005); *see also* Hanson R.K., Gordon, A., Harris, A.J.R., Marques, J.K., Murphy, W., Quinsey, V.L., & Seto, M.C., *First Report of the Collaborative Outcome Data Project on the Effectiveness of Treatment of Sex Offenders.* 14 Sexual Abuse: A Journal of Research and Treatment 169 (2002); Polizzi, D.M., MacKenzie, D.L., & Hickman, L.J., *What Works in Adult Sex Offender Treatment? A Review of Prison and Non-Prison Based Treatment Programs. 43 International Journal of Offender Therapy and Comparative Criminology,* 357 (1999).

[27] Chicago Daily Law Bulletin, Jan. 3, 2011, Vol. 157 Issue:2.

28

reoffending."[28] That report further states, "Programming also is key, as research demonstrates that a combination of surveillance and treatment is more effective at reducing recidivism than reliance on monitoring and control alone. Supervision can improve public safety and individual outcomes while maximizing the use of scare correctional dollars by focusing on high-risk offenders and incorporating critical community-based mental health and substance abuse services, education and employment assistance."[29]

While this Court can order Mr. Boroczk to participate in sex offender treatment when he is released from prison, we remind the Court and the government that Congress has declared it *inappropriate* for a court to impose a term of imprisonment for the purpose of rehabilitating the defendant or providing the defendant with needed educational or vocational training, medical care, or other correctional treatment in Title 28 U.S.C. § 944(k) (emphasis added); separately, in 18 U.S.C. § 3582(a), the law states, ". . . imprisonment is not an appropriate means of promoting correction and rehabilitation." Also, in *Tapia v. United States*, 2011 WL 2369395, *6 (2011), the Supreme Court has said, "A sentencing judge shall recognize that imprisonment is not appropriate to promote rehabilitation . . . ." For these reasons alone, this Court cannot sentence Mr. Boroczk to a longer prison term under the guise of providing him with treatment. This is

---

[28] *Available at*
http://www.pewcenteronthestates.org.uploadedFiles/Few_State_of_Recidivism.pdf.

[29] In turn, we note a recent study of nearly 150,000 federal offenders on probation or supervised release demonstrates that the vast majority of those individuals released from prison onto supervised release do not commit new crimes, and even Kristine Phillips, the Chief Probation Officer for the Northern District of Illinois, stated that 2010 re-arrest rate was a low 3.5% with new criminal charges. Federal Probation, *A Journal of Correctional Philosophy and Practice*, December 2010 edition, *available at* uscourts.gov/FederalCourts/ProbationPretrialServices/FederalProbationJournal.aspx.

automatically so because of the two important statutes above, but we also know that he will receive very limited, if any, help inside the Bureau of Prisons.

Put simply, Mr. Boroczk is not going to be guaranteed any spot in a treatment programs nor even placement at any one of eight facilities that house sexual offense defendants, even if recommended by the Court. This is especially true because the standard protocol of the Bureau of Prisons includes possible placement into the Sex Offender Management Program *at the end of the offender's sentence* so that treatment can continue through supervised release. *See* Exhibit Q, Memo by James Tibensky, Federal Defender Program Mitigation Specialist. Of eight total Sex Offender Management Programs within the Bureau of Prisons, only one is a residential Sex Offender Treatment Program;[30] the other seven facilities offer treatment including six to eight hours of counseling a week for a period of six months. This means that, even if admitted, Mr. Boroczk will serve the vast majority of his entire sentence in the general population without any, or minimal, mental health services.

As stated by the Center for Sex Offender Management, "In many instances, policies and procedures for the management of sex offenders have been driven by public outcry over highly publicized sex offenses."[31] The Center implores criminal justice practitioners, including the courts, to avoid "reactionary responses that are based on public fear of this population;" it advises courts to make sentencing decisions that are based on the careful assessment of the individual's likelihood of recidivism. Likewise, the National Association of Criminal Defense

---

[30] That program is very small and is reserved for the most serious and violent sexual offenders with a capacity for 112 offenders.

[31] *Available at* http://www.sexoffender.com/sorecidivism.html, at 5.

Lawyers wrote a Report of the Sex Offender Policy Task Force, dated February 24, 2007, and stated:

> The ostensible purpose of lengthy mandatory sentences is to ensure the incapacitation of the offender in an effort to protect the community. The call for such sentences is based upon the belief that sex offenders cannot be rehabilitated and will commit further sex crimes upon their release from incarceration or probationary sentences.

We respectfully submit that there is no reason nor evidence to support a sentence greater than fifteen years in this case.

## IV.     Conclusion

Even with a fifteen year sentence, Mr. Boroczk would still spend a decade and a half in prison. His actions have resulted in his lost opportunity to parent his children, as they will be adults nearly in their twenties and thirties by the time he is free. A sentence of fifteen years would accomplish the very same thing that a sentence in the Guidelines' range would achieve in deterring him and others, as well as reflecting the seriousness of the offense, protection of the public, and providing just punishment for his crimes. Mr. Boroczk fully understands that his offense is both legally and morally wrong, but he has accepted responsibility for his conduct. Mr. Boroczk's sentence is enhanced because of characteristics that apply to the majority of sex offenders in a way that overinflates the severity of the offense, and simultaneously, proves to be a poor indicator of culpability.

A sentence of fifteen years is still a serious term of imprisonment for Mr. Boroczk. That term would surely reflect the seriousness of the offense and promote respect for the law as it is an extremely long and harsh sentence, but he is an individual who has only recently received the

benefit of any evaluations, treatment, programs or services geared towards his specific issues and addictions. A sentence of fifteen years would better fit the goals of § 3553 than a life sentence for all the reasons presented in this Memorandum. It would be the sufficient, but not greater than necessary sentence.

      WHEREFORE, we respectfully request a fifteen year sentence for all the reasons presented.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
Carol A. Brook,
Executive Director

By:     */s/ Helen Kim Skinner*

55 East Monroe, Suite 2800
Chicago, IL 60603
312. 621. 8344

32

## CERTIFICATE OF SERVICE

The undersigned,____HELEN KIM SKINNER____, an attorney with the Federal

Defender Program hereby certifies that in accordance with FED.R.CIV.P5, LR5.5, and the

General Order on Electronic Case Filing (ECF), the following document(s):

### DARRICK BOROCZK'S SENTENCING MEMORANDUM

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by

first-class mail/hand delivery on ___July 27___, 2011, to counsel/parties that are non-ECF filers.

TRACY PHILLABAUM
U.S. Probation Officer
55 E. Monroe, 15th Floor
Chicago IL 60603

By:        _/s/ Helen Kim Skinner_____

FEDERAL DEFENDER PROGRAM
55 E. Monroe St., Suite 2800
Chicago, Illinois 60603
(312) 621-8344

IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA  )
          )  No.  09 CR 647
   v.        )
          )  Judge Ronald A. Guzman
DARRICK BOROCZK    )

## DEFENDANT DARRICK BOROCZK'S EXHIBITS TO
## SENTENCING MEMORANDUM

Exhibit A -  Science Fair Picture and Earned Certificates

Exhibit B -  Letter from Eugene Boroczk

Exhibit C -  Aviation Camp Pictures

Exhibit D -  Service Excellence Recognition Award

Exhibit E -  Darrick Boroczk Résumé

Exhibit F -  Letters of Appreciation

Exhibit G -  Letter from Darrick Boroczk

Exhibit H -  Excerpt from the United States Sentencing Commission Data File

Exhibit I-  Clinical Progress Report by Mickey Morgan, Psy.D. (12/1/10)
    and Letter (7/21/11) (*Under Seal*)

Exhibit J -  Forensic Psychological Evaluation by Michael Fogel, Psy.D., ABPP
    (Forensic) (*Under Seal*)

Exhibit K -  Michael Fogel, Psy.D., ABPP, Curriculum Vitae

Exhibit L -  Darrick Boroczk's Letters to His Children (*Under Seal*)

Exhibit M -  Certificate from In Pursuit Ministries dated May 24, 2010, and Source of
    Light Schools Certificate

Exhibit N -     Letter from Sandy Boroczk

Exhibit O -     Letters from Others

Exhibit P -     Letter to Jeffrey Perconte from Tracy Rogers, Ph.D.

Exhibit Q -     Memo by James Tibensky

# Exhibit A
# Science Fair Picture and Earned Certificates



DARRICK - SCIENCE FAIR



# 1989



# Exhibit B
# Letter from
# EugeneBoroczk



Eugene P. Boroczk

March 1, 2011

Honorable Ronald A. Guzman
United States District Court
219 S. Dearborn St.
Chicago, IL

        Re: Darrick Boroczk

Dear Judge Guzman:

      I am writing on behalf of my son, Darrick Boroczk. When I heard that he was arrested and what the charges were, I cried. I was shocked. I didn't know what to say or do. I thought there must be some mistake. Sadly, there hadn't been a mistake. My wife and I could not believe what we were told. Life does not prepare you for something like this.

      Not to minimize the severity of his crime, however, I ask for this opportunity to let you know the kind of person Darrick was as a child, teenager, and young adult.

      Darrick, as a young child, by all accounts, had a normal childhood. He played well with other children and was well liked by the other kids, as well as by their parents. Darrick went to school without any problems. He received good grades in most of his classes, and he always had an interest in science and, more specifically, in space exploration and the technology involving space exploration.

      At home, Darrick did what was expected of him around the house. As a teenager, his regular chores were taking out the garbage, cutting the grass and raking leaves, cleaning up after the dogs, and washing the floors. He always did his chores without complaining and did any other tasks we asked him to do. He also did other things that I needed help with and never complained. We worked on projects together such as installing cabinets, dishwasher, floors, tile, and fences among other things around the house.

      When he turned sixteen he got his drivers license. This was a big help because my mother-in-law lived with us and many times she had doctor appointments, chemotherapy appointments, or needed a medication refill. Darrick was able to do these things for her if my wife and I were at work.

Page 1 of 3

March 1, 2011

In his junior year of high school, Darrick got a job at Office Depot part-time—the first time he had ever applied for a job. They were impressed with his computer knowledge so he was hired to work on the floor in the computer department answering customers' questions and helping them purchase computers and software. During his junior and senior year of high school, working at Office Depot helped him pay for his car insurance and provided a little extra spending money.

Darrick was always into computers. He could fix them and make them go faster and enjoyed playing the usual PC games. Then he even started building computers and talked about wanting to have his own computer business.

He was always a kid that stayed "close to home." He would always tell his mom or grandmother or me anything out of the ordinary that was going on with his friends since he thought we should know and then we would talk about it. We always discussed what may be a good idea and why or what may be a bad idea and why. There was never any behavior that was out of the ordinary and he was never in trouble previously. The thing about Darrick, however, is that he is not very street smart and could be naïve.

All in all, Darrick is a good person who found himself addicted to porn and too ashamed and too embarrassed to talk about it with anyone. Later, he told my wife he didn't want to burden her with his problems so he didn't say anything.

Darrick was unhappy with his marriage but he said he remembered how sad and hurt he was when my wife and I separated for several years when he was quite young, so he wanted to try to keep the marriage together. However, as he tried to escape the escalating unhappiness at home, (financial problems due to his increasing family size and problems with the kids misbehaving), he explored the internet and eventually wound up in adult chat rooms seeking female companionship. These adult chat rooms are full of what I call "adult predators" who seek out the vulnerable and the naïve who they can brainwash and manipulate into doing things a person would not normally do. I am not justifying what happened, only trying to explain how a good person can go astray, how a curiosity can turn into an addiction, and then the people you love and care about more than anything in the world being hurt the most.

When I thought things couldn't get much worse, seven weeks ago I received a call that my 36-year old son from a previous marriage had been found in a coma from a drug overdose and died two days later. He had been struggling with drug and alcohol addictions for the past four years. Unfortunately, we have many family members who have had problems with addictions, including myself and my father. Darrick stayed away from drugs and alcohol because of this fact, but he never realized how the internet would become his addiction. As he explained to us in one of his letters, looking back he said he couldn't understand what had come over him. He said he felt like he was "on drugs" even though he wasn't and he didn't know what it was or what to do. And now we are going to counseling with my 14-year old son who has become addicted to video games to the point of not eating and trying to take sick days so that he can stay home from school.

March 1, 2011

Very truly yours,

Eugene P. Boroczk

# Exhibit C
# Aviation Camp Pictures

# Oak Lawn youth spends week in space

By Linda J. Steger



Dietrich Borecki (Stevens) of Oak Lawn displays Space Camp memorabilia. (Photo by Eileen Weber)

AUGUST Harvest of Values

Grade 'A'
Extra Large

OAK LAWN
SPECIALS ONLY

The Oak Lawn
Store Now
Egg Store/Record
Accepts Mastercard
& Visa Charges



Derrick at Space Camp - Huntsville, AL



# Exhibit D
# Service Excellence
# Recognition Award

# 1996

# Moraine Valley College





*Provided prompt and exceptional service*

*in the Tech Lab*



# Exhibit E
# Darrick Boroczk Résumé



# DARRICK BOROCZK
– Wheeling, IL
Work: — Home:

## SUMMARY

Administrative support professional with 3 years experience as a Warehouse Specialist at Baxter Global Technologies, Inc. and more than 5 years of experience in the Hardware Tracking Dept. of Cardinal Healthcare, Inc. Adept at working in fast-paced environments demanding strong organizational, leadership and interpersonal skills. Committed to exceptional customer service and driven by challenges. Detail-oriented and resourceful in spearheading, organizing and completing projects; ability to multi-task effectively.

## AREAS OF EXPERTISE

Expert problem solving skills and able to efficiently resolve any problems that may arise; expert communication skills with customers and with all levels of management; adept at following through with respect to all job tasks and functions; and consistently processed all sales orders without errors.

- Team player with proven outstanding work record with Baxter and Cardinal Healthcare, Inc.
- Demonstrated ability to multi-task along with strong attention to detail.
- Able to manage time efficiently and quickly absorb fundamentals of new tasks.

## EXPERIENCE

**Baxter Global Technologies, Inc., Buffalo Grove, Illinois**              **2005-Present**
*Warehouse Specialist*

Maintained excellent communication with management, Quality Management, sales representatives, sales operations, warehouse clerks, and customers. Successfully controlled entire finished goods warehouses (1HW, 1R1, 1B2) such as shipping, receiving, overstock and stocking; and worked extensively with unreleased warehouse inventory (1XW, 1YR, 1X4). Accurately prepared various reports: open orders by RSD, stock status, BtB, MyOppi ship-confirming and entered received inventory into JD Edwards; and familiar with all RF device functions.

- Assisted management in projects and training as needed.
- Worked daily with Quality Management on processing of inbound unreleased material.
- Implemented streamlined procedures and/or processes to keep operating costs down.
- Assisted in parts shipping when necessary.
- Revised temperature/humidity charts for warehouse assistant in physical inventories.
- Approved all miscellaneous shipping requests.

**Cardinal Healthcare, Inc., Waukegan, Illinois**              **1998 - 2005**
*Inventory Analyst*

Planned and organized work under minimal supervision of manager. Proven ability to effectively multi-task in all situations. Provided assistance to customers in an efficient and friendly manner. Proven combination of technical and communication skills. Proven organizational and time management skills. Assembled hardware orders in minimal time; nearly 100% accuracy rate in ship-confirming, receiving PO's in JDE and SAP.

- Supported Supervisor of Hardware Tracking Department in all facets of department operations.
- Successfully completed all projects on time and under budget.
- Prepared quarterly inventory of hardware products.
- Reviewed and analyzed Hardware Tracking Open Order Reports on a daily basis.
- Analyzed hardware orders for accuracy.

### *Warehouse Skills*

Knowledge of all warehouse equipment including the high-reach, sit-down, turret truck, counter-balance, slip sheet/pull sheet, walkie rider, and swing reach; experienced in picking, packing, shipping, receiving, FedEx & UPS shipping software.

### EDUCATION

Oak Lawn High School, Oak Lawn, Illinois                    1995
*H.S. Diploma, General Education*
Bachelor's Degree anticipated within three years—partial coursework at Moraine Valley College, Palos Hills, Illinois. Technology, General Education classes

### ADDITIONAL SKILLS

- Maintained excellent customer service.
- Proficient in JD Edwards (GUI & Green Screen), Field Force, MyOppi, CIT, Microsoft Office Professional, Windows Vista, Windows XP and Windows 2000 Professional, Excel, Word, Power Point, Lotus Notes, Metaphase, Internal FCA Site, all operating systems 1995-2007, data entry, and 10-key calculator.
- Knowledgeable in computer systems:  Building and testing; computer assembly; integration; software configuration; hardware configuration; hardware installation; diagnosis and trouble-shooting; and maintenance, repair and troubleshooting/problem solving.

# Exhibit F
# Letters of Appreciation

Baxter Healthcare Corporation
Route 120 and Wilson Road
Round Lake, Illinois 60073
847.546.6311


***Baxter***

March 16, 2004

Mr. Robert Devereaux
Manager, Region Operations
███████████

Dear Mr. Devereaux:

I would like to share my appreciation for the tremendous efforts of two individuals on the Cardinal team. In their role as dedicated professionals, Karl Simmet and Darrick Boroczk have demonstrated outstanding commitment and responsiveness to achieve our common goals.

As you know, the last week of every year is extremely challenging, and 2003 was no exception. The volume of hardware orders placed the last day of the year was incredible. Karl and Darrick were exceptionally accessible, prompt in addressing any concerns, extremely flexible and patient with last minute requests.

Thank you again for providing them as a valuable resource for Baxter Healthcare. Sorry I did not get this to you sooner, but please pass along my sincere thanks.

Kind regards,

David Bonderud,
President, Medication Delivery, U.S. Region
Baxter Healthcare Corporation


DLB/jw


Made from
recycled material

From: ███████████████████████████████
Sent: Thursday, January 26, 2006 5:23 PM
To: █████████████████████████████
Subject: Fw: Outstanding employee

**Darrick C. Boroczk**
**Whse. Specialist/Group Leader**
**Buffalo Grove, IL.**
**Baxter G.T.S.**
██████████

----- Forwarded by Darrick Boroczk/MedDel/NA/Baxter on 01.26.2006 17:16 -----

**Teddie Hudson/MedDel/NA/Baxter**          To ████████████████████████

                                            cc ██████████
**01.26.2006 15:44**
                            ████████████████████████

                            Subject Outstanding employee


**Ed,**

**I just wanted to say THANK YOU to Darrick.**

**He is an employee always willing to go the extra mile.  I had an emergency today and thanks to Darrick it is under control and the customer will get their pumps when the need them.  This is not the first time Darrick has gone beyond, he exceeds expectations everyday.**

**It is a pleasure working with Darrick.**

**Teddie Hudson**
**Business Operations/Hardware**
██████████████

http://www.baxter.com/email_disclaimer

**From:** ▬▬▬▬▬▬▬▬▬▬▬▬
**Sent:** Monday, May 22, 2006 9:43 AM
**To:** ▬▬▬▬▬▬▬▬▬▬
**Cc:** Sandra Stevens
**Subject:** Fw: New Award!

Darrick C. Boroczk
Whse. Specialist/Group Leader
Buffalo Grove, IL.
Baxter G.T.S.
▬▬▬▬▬▬

----- Forwarded by Darrick Boroczk/MedDel/NA/Baxter on 05/22/2006 09:40 AM -----
Award Headquarters <Awards@BaxterRewards.com>          ▬▬▬▬▬▬▬▬▬▬▬▬

05/20/2006 12:31 AM                                    ▬▬▬▬▬▬▬▬▬
                                                       Subject New Award!

| Please respond to |
| <Awards@BaxterRewards.com> |

Awarded by: **Lisa Seller**

**Congratulations! You have received an award via Baxter Rewards.**

Award Type: Debit Card

The following comments are from the Giver:
Darrick thank you for your efforts in helping with the Flogard Clean up and the rental program.

To find out more, please login at
http://www.baxterrewards.com.

**Standard Delivery Time:**
**Delivery time for gift certificates is 2 business weeks**
Delivery time for Baxter Rewards debit card is **5 to 7 business days***

*Note: The Baxter Rewards debit card is a reloadable card product good for 3 years. **Please do not discard.**

***Please do not reply to this email***

The information transmitted is intended only for the person(s)or entity
to which it is addressed and may contain confidential and/or legally
privileged material. Delivery of this message to any person other than
the intended recipient(s) is not intended in any way to waive privilege
or confidentiality. Any review, retransmission, dissemination or other
use of, or taking of any action in reliance upon, this information by
entities other than the intended recipient is prohibited. If you
receive this in error, please contact the sender and delete the
material from any computer.

For Translation:
http://www.baxter.com/email_disclaimer

# Exhibit G
# Letter from Darrick Boroczk

Dear Judge Guzman:

First, let me thank you for taking the time to read this letter. With that being said, by writing this letter, I am not trying to alleviate any responsibility or the severity of the damaging and horrible crimes I have committed against my children, family and society. I can only imagine what it would be like to be my attorney, or you ... or even the prosecutor in a case such as this. I don't know if you have children, but even whether you did or didn't, I can only imagine what it would be like to defend me. Then to be you, and to have to view this horrible media ... for all of you to go home day after day knowing that stuff like this goes on every day. If I had been the receiver of the news about what I ultimately did, if it had been done to my sister or daughter, I would be on a manhunt. I would not have been able to stand it if I would have heard of such an event happening to any of them by someone's hands. How I ended up doing it to my own children is unfathomable and unpardonable. It is abominable. I am not sure I will ever be able to appropriately express my remorse and the great frustration I have because of what I did.

The nearly insurmountable amount of damage I have caused to my wife, my children, my parents, my siblings, my in-laws, and even society, is all on me, alone, and it is almost, in my opinion, incalculable. I am still learning about all of the complications associated with this kind of addiction. How it effects everybody, regardless of whether it is direct or indirect. I have and still spend a lot of time trying to figure out how I can correct this heinous crime against my family as well as against society. The mere thought of it now turns my stomach. I am currently talking to a counselor to help me understand how I committed the crimes that I did. His name is Dr. Morgan. He is teaching me how to stop any of the destructive thoughts that are associated with addictions such as the one I had. I am also taking classes on how to stop addictions and dependencies. The class is biblically based. I have never historically been a very religious person in the past. However, I believe that between the counseling, and the guidance of the Bible and the word of God, I will be able to still be a productive member of society again. I feel that my faith has had a tremendous impact on my thoughts, morals, and ethics as a whole. Not only am I taking steps to learn how to prevent something like this from ever happening again in the future, but I am learning how to use my own defenses against the addictions that I had. My moral, ethical and spiritual boundaries are being built up now, so there is no way, no matter what, that I well ever violate a child again.

1

I do hope that you will understand that, initially, my draw to the computer was innocent. I was having many issues with my wife, and we were very emotionally detached from each other and had been for a long time. After a long day at work, usually 9 to 12 hours at a time, I would come home and go to my computer, look online, and find things I was interested in – games, new PC hardware, science stuff. Things like that. Eventually, though, I found other sites such as yahoo or MSN groups. I started chatting with females, and males, too. Online, how you look, dress or talk is inconsequential. I had never been the kind of person to go to a bar or club. I suppose I was just looking for people with whom I could talk to without argument or judgment. I felt accepted by these strangers I would meet. The internet was the perfect medium for my escape from the life that I did and didn't have.

As time went on, I was introduced to other people and/or I found people who seemed interesting through the internet chat rooms. Unfortunately, I tend to be an open-minded person. I have always been willing to try new things, including music, food, or other various things. I believe this is how I eventually ventured into an area of the internet that others deem "taboo." As I saw more and more of the various adult porn sites I frequented, I found myself searching for something more. I was, in the meantime, continuing to meet many other people into all sorts of pornography. I believe I was enjoying the idea of having "friends," acceptance and companionship, of sorts. But I was also becoming desensitized to what would be called the more "mainstream" material. And contacts would eventually ask me if I had seen anything "better." When I would ask what they mean, I would receive a sample or someone would direct me to a link with illegal and horrible material. My curiosity would take hold, and only eventually – not initially – did I begin to develop an actual interest in the material I would see. As a computer geek, I knew about programs that made the transfer and trade of material more efficient and streamlined. All this only made it easier for me to feed what became my own growing addiction, a hundred fold.

More than a few times, I tried to stop. On my own, I deleted nearly everything I had, and purged everything from my computer. But I believe I was under the influence of something infinitely more damaging than any drug or alcohol addiction. I would find myself drawn back into contact with my "online friends," who I now know were not "friends." True friends would have never asked me nor tempted me to do such horrible things to or with my children. Perhaps I wanted to believe the things they would tell me. I wanted to believe

2

that my children were at an age young enough that they might not remember what I was doing anyway. The last thing I ever wanted to do was hurt anyone. Especially my children. But each time I found myself drawn back into my extremely toxic and damaging addiction, I would only find that it seemed that I was had stronger feelings than the previous time. I would find myself devoting more and more of my time to the computer. I had a P2P (Peer to Peer) program set up so I could always acquire new material, even when I was away from my computer. I never even saw half of what I downloaded, due to the sheer volume of material that was being collected for collection's sake. I finally stopped after the internet service was terminated due to our payment delinquency. Even then, though, I found the need to fuel my addictions in another way. I started playing video games whenever I wasn't working 60 or more hours a week. It got to the point where I alienated my whole family so that I was not there, physically, mentally or emotionally.

In short, I have single handedly torn apart, burnt and shattered everything that I was supposed to cherish and protect. I became the very thing to my children that every parent fears the most – including me. The horrifying fact remains that I sent and helped distribute pictures and videos while I was in this horrible disillusioned state of addiction. I truly hate to fathom the thought of how my evil and addiction has exacerbated this continuing problem. It causes me great ire and sadness to know how many more exploited children are out there ... to think of the countless broken families and the heartache for all the people who are left picking up the pieces of children who are the victims. Realizing this, more and more as time goes on, creates a searing pain into my very core. I truly feel that I am as low as the scum on someone's shoes. I am sincerely glad that law enforcement agencies exist in this country to end to this kind of activity. I can still recall the day the "ICE" agents arrested me outside of my home with guns drawn on me like I was some sort of animal. It's like yesterday in my mind. I kept looking to make sure no one was watching. The initial sheer shock and embarrassment for everyone was and still is incredible. But I thanked one of the agents who arrested me when I was caught.

My crime has affected my family and me in an extremely profound way. My whole world has come crashing down around me. This is not just affecting me. It is my whole family. To begin, I destroyed a good paying career. Which now leaves me impoverished and unable to provide for my family as I am supposed to do. I have also lost my wife. I am a disappointment as well as a stranger to

3

her. I have also put an emotional and a financial strain on her and my children. She was forced to sell things and personal property in order to have money for herself and the kids as well. My wife now has five children, aged ten and under, to raise with limited support. I was their sole support for the most part. She now has to be both the mother and father. She has to cook, clean, take care of the kids and do shopping for everyone. But I have also put a strain on my in-laws because my wife and children are now living with them. My father in-law had to sell one of his two cars to buy my wife a vehicle to support the six of them. There are now nine people living in one house. I have also put an emotional and financial strain on my parents and my two siblings. I am the oldest child and the spoiled one. I still am in a lot of ways. I have failed as a role model for my two younger siblings. Aside from not being able to be their for their graduations, as well as teaching them to drive and all the other fun stuff big brothers are supposed to be there to see and do.

I have learned that using my children in the manner that I did causes a lasting effect on their development. It robs them of their identity and their ability to have normal relationships. They may have a hard time trusting people or they may have a hard time developing healthy relationships with members of the opposite sex in adulthood. A child has no way to defend himself or herself from this kind of treatment, and it is a very confusing situation. Especially if the person harming them is a trusted parent, relative or close friend. The child may know something is not right, but at the same time, be trusting of the monster that is using them in a very cruel and harmful way. I robbed my own children and other children of their innocence and that can never be regained. As I have said, I take full responsibility for my actions. But this is not who I am or what I am.

I know it may be hard to think of me as anything but a monster for all that I did, and frankly, I cannot argue with that. But as I explained, I traveled a very dangerous, destructive and addictive path, and I am human. We all have our weaknesses, downfalls, as well as blind spots. But I am also a very kind, gentle, understanding, and loving, son, brother, father, and husband. I miss my whole family. My parents, brother and sister support me, still. Even after all I have done. That alone leaves me speechless. I don't know where I would be without them. Not just now, but through all the fixes I have found myself in while growing up. I'm glad I had the wonderful opportunity to be a big brother. It has been a very interesting experience, especially since I was nearly 21 years old when they were born. I believe they have taught me much more than I have

taught them. I am not even sure why they hold me in such high regard. I haven't done anything all that special. I just hope I will be able to preserve that unyielding faith and love they have for me. As my mother puts it, "I am their #1." I have learned that my brother and sister will always need a big brother. That will never change. I am someone who is treatable, and I become stronger spiritually, morally and ethically everyday.

My children mean the world to me. They are all equally loved and appreciated by everyone in my family, and each is unique in his or her own way. I could not imagine life without them. To miss all the events in my kids' lives is a tragedy in itself. I believe that someday, my ability to speak to them again will help in the healing process, for them as well as myself. To completely and permanently lose my children would decimate me. But I also believe it would cause further trauma to them, as well, in the long run. I still hope to also be able to be an integral part in the lives of my children someday. I hope they can someday trust me again. Even if it may be years from now because I know that I have a debt to pay.

My hopes and plans for the future are many. My greatest hope is that I can repair the damage to my family, meaning my children, wife, siblings, parents and in-laws, especially. I would like to find a church that I can call home when I am released. I would like to try and find a happy balance in life. I plan to use this new chapter in my life to learn as much as I can on not only my own addiction and issues, but also what I can do to help the planet. I want to leave this world with as few regrets as possible. I wish I could assist law enforcement - obviously, in a closely monitored and secured manner. With my computer knowledge and my knowledge of how these people operate I believe I could be an asset in this war against child exploitation. But I also understand if that may not be feasible. I also know that while I cannot make you believe me, I have too much life left in me to ever want to go back to that kind of activity ever again.

I want to thank you for taking the time out of your busy schedule to read this letter. I am sure you will use your discretion to judge me fairly and appropriately in this important decision. I throw myself on the mercy of this Court. I know that I have a lot of work ahead of me to make amends for my unconscionable behavior toward my children and all of the other children who are not able to defend themselves.

Darrick Boroczk

5

# Exhibit H
# Excerpt from the United States Sentencing Commission Data File

Below Range Sentences[1] for Child Pornography Cases (§2G2.2)
All Districts
Fiscal Year 2007 through 2009[2]

| Year | Total | Below Guideline Range | | | | |
|------|-------|--------|---------|------------------------------|-------------------|-----------------------------|
| | | Number | Percent | Average Guideline Minimum[3] | Average Sentence[4] | Average Percent Reduction |
| 2007 | 853 | 263 | 30.8 | 107 | 71 | 36.3 |
| 2008 | 1,255 | 528 | 42.1 | 106 | 67 | 38.5 |
| 2009 | 1,546 | 797 | 51.6 | 111 | 68 | 40.3 |

[1] "Below Range Sentences" do not include substantial assistance departures or Early Disposition departures.

[2] Only cases in which all sentencing documents were submitted to the Sentencing Commission are included in this analysis. Also, the Child Pornography guidelines were drastically amended on November 1, 2004, and only cases that are subject to these amended guidelines are used in this analysis.

[3] Any guideline minimum greater than 470 months, including "Life", were capped at 470 months.

[4] Any sentence greater than 470 months, including "Life" sentences, were capped at 470 months.

SOURCE: United States Sentencing Commission Data File OPAFY2007 - OPAFY2009.

Below Range Sentences[41] for Child Pornography Cases (§2G2.2)
7th Circuit
Fiscal Year 2007 through 2009[42]

| Year | Total | Below Guideline Range | | | | |
| | | Number | Percent | Average Guideline Minimum[43] | Average Sentence[44] | Average Percent Reduction |
|------|-------|--------|---------|-------------------------------|----------------------|---------------------------|
| 2007 | 57 | 12 | 21.0 | 115 | 82 | 30.5 |
| 2008 | 75 | 33 | 44.0 | 126 | 83 | 37.8 |
| 2009 | 76 | 31 | 40.8 | 137 | 100 | 30.6 |

[41] "Below Range Sentences" do not include substantial assistance departures or Early Disposition departures.

[42] Only cases in which all sentencing documents were submitted to the Sentencing Commission are included in this analysis. Also, the Child Pornography guidelines were drastically amended on November 1, 2004, and only cases that are subject to these amended guidelines are used in this analysis.

[43] Any guideline minimum greater than 470 months, including "Life", were capped at 470 months.

[44] Any sentence greater than 470 months, including "Life" sentences, were capped at 470 months.

SOURCE: United States Sentencing Commission Data File OPAFY2007 - OPAFY2009.

# Exhibit I
# Clinical Progress Report
# by Mickey Morgan, Psy.D.
# (12/1/10) and Letter
# (7/21/11) (*Under Seal*)

# Exhibit J
# Forensic Psychological Evaluation by Michael Fogel, Psy.D., ABPP (Forensic) (*Under Seal*)

# Exhibit K
# Michael Fogel, Psy.D., ABPP, Curriculum Vitae



**MICHAELFOGEL**
BOARD CERTIFIED FORENSIC PSYCHOLOGIST

Fellow, American Academy of Forensic Psychology
Diplomate, American Board of Professional Psychology
Board of Directors, American Board of Forensic Psychology

Curriculum Vita
February 2011

## Education

Doctor of Psychology in Clinical Psychology, Illinois School of Professional Psychology/Chicago, Chicago, Illinois, September 1998

Bachelor of Arts in Psychology, The Ohio State University, Columbus, Ohio, June 1994

## Licensure/Certifications

Diplomate in Forensic Psychology, American Board of Professional Psychology (2003 - present)
Licensed Clinical Psychologist, Illinois (2002 - present)
Licensed Clinical Psychologist, Massachusetts (1999 - 2002)
Massachusetts Certified Health Service Provider (1999 - 2002)
Designated Forensic Psychologist, Massachusetts (2001 - 2002)
Qualified Examiner, Massachusetts (2000 - 2002)
Licensed Clinical Psychologist, Missouri (1999 - 2000)

## Professional Memberships/Activities

American Academy of Forensic Psychology - Fellow
American Board of Forensic Psychology - Diplomate
- Board of Directors, Member (2010 - Present)
  - o National Chair of Examinations (2011 - Present)
- Committee for Written Examination Update and Revision, Member (2008 - 2010)
- Appeals Committee, Member (2008 - 2009)
- Oral Examination Committees, Chair and Member (2004 - 2006)
American Psychological Association (APA) - Member
APA Committee on Professional Practice Standards, Member (2011 - Present)
American Psychology and Law Society - Member
Association for the Treatment of Sexual Abusers - Clinical Member

## Professional Work Experience

**The Chicago School of Professional Psychology**
Chicago, Illinois
Associate Professor

Faculty, Department of Forensic Psychology
August 2010 - Present

Teach various forensic psychology courses to master's- and doctoral-level students. Supervise the completion of master's theses and doctoral dissertations. Advise students. Provide forensic mental health services and clinical supervision in The Chicago School Forensic Center (the practice arm of the department). Serve on departmental and institutional committees.

225 West Washington Street ◆ Suite 2200 ◆ Chicago, Illinois 60606
T: 312.933.3023 ◆ F: 847.570.9244 ◆ E: mfogel@drmichaelfogel.com ◆ W: www.drmichaelfogel.com

*Chair, Department of Forensic Psychology*
May 2007 - August 2010

Oversaw the development, coordination, and management of the Department of Forensic Psychology, which included a Master of Arts in Forensic Psychology program, a Doctorate (Psy.D.) in Clinical Forensic Psychology program, and The Chicago School Forensic Center. Served on various departmental and institutional committees, engaged in program related research, advised students, taught forensic psychology courses, and provided forensic mental health services and clinical supervision in The Chicago School Forensic Center.

*Associate Chair, Department of Forensic Psychology*
January 2006 - April 2007

Assisted with the overall coordination and management of the Master of Arts in Forensic Psychology Program. Served on faculty, ad hoc, master's thesis, and dissertation committees. Supervised program and adjunct faculty. Participated in the research and production of necessary program-related, self-study reports. Served as an advisor to master's level students. Taught various forensic psychology courses to master's- and doctoral-level students.

**Independent Practice**
Chicago, Illinois
July 2002 - Present

Provide forensic psychological evaluation and attorney consultation services at the state and federal level.

**Illinois Department of Corrections**
Chicago, Illinois
Personal Services Contractor
January 2006 - Present

Provide expert witness testimony for those sexually violent person evaluations I conducted, or assumed responsibility therefor, in which a civil commitment petition was filed while I was Director of the Illinois Department of Corrections Sex Offender Evaluation Unit. Also update previously conducted evaluations.

**Health & Human Services Group**
Mission Viejo, California
Clinician - Chicago Field Division
October 2009 - Present

Contracted to provide limited mental health counseling, critical incident debriefing, and training to Drug Enforcement Administration (DEA) employees and their family members.

**MHM Correctional Services, Inc.**
**Illinois Department of Corrections**
Chicago, Illinois
Director, Sex Offender Evaluation Unit
May 2003 - December 2005

Provided overall development, coordination, and supervision for the assessment of sex offenders prior to their release from the Illinois Department of Corrections. Approximately 1500 evaluations were conducted annually to determine adult and juvenile offenders' appropriateness for referral for commitment under Illinois' Sexually

Violent Persons Commitment Act. Evaluations were also completed to facilitate the community management of adult sex offenders by parole agents. Responsibilities included supervising the above evaluations completed by 4 doctoral-level evaluators and 5 master's-level evaluators; assigning cases; conducting SVP Commitment Act evaluations and file screens; communicating with IDOC Chief Legal Counsel, Coordinator for Sex Offender Services, and Chief of Mental Health Services; and serving as liaison with the Office of the Illinois Attorney General and State's Attorney's Offices throughout Illinois. Provided expert witness testimony, attorney consultation, and staff training.

**Davken Associates, P.C.**
Chicago, Illinois
Therapist/Examiner
July 2002 - January 2003

Conducted individual psychotherapy and psychological examinations with geriatric and other adult patients residing in long-term care facilities.

**University of Massachusetts Medical School**
**Bridgewater State Hospital**
Bridgewater, Massachusetts
Designated Forensic Psychologist
March 2000 - June 2002

Conducted court-ordered evaluations regarding competency to stand trial, criminal responsibility, aid in sentencing, restoration to competency, ability to await trial in a penal setting, ability to serve a sentence in a correctional facility, need for care and treatment (i.e., civil commitment), appropriateness for transfer to a less secure facility, and violence risk assessment. Provided expert witness testimony in District and Superior Court.

**Independent Practice**
Quincy, Massachusetts
Qualified Examiner
November 2000 - June 2002

Conducted forensic evaluations to assess the sexual dangerousness of inmates, prior to their release from custody, who were convicted of a statutorily defined sex offense (i.e., Probable Cause Evaluations). Conducted court-ordered evaluations to assess the sexual dangerousness of residents of the MA Treatment Center wherein probable cause was found or they were previously adjudicated a Sexually Dangerous Person and were appealing that finding. Provided expert witness testimony in Superior Court and attorney consultation.

**University of Massachusetts Medical School**
**Old Colony Correctional Center**
Bridgewater, Massachusetts
Clinical Coordinator/Psychologist II
September 1999 - March 2000

Responsibilities included the development and maintenance of a specialized treatment program for inmates with a broad range of mental disorders who were convicted of various offenses. Also conducted group psychotherapy and psychological testing.

**University of Missouri - Kansas City School of Medicine**
**Missouri Department of Mental Health**
Kansas City, Missouri
Forensic Psychology Post-doctoral Fellow
September 1998- September 1999

### *Western Missouri Mental Health Center - Forensic Services*

Conducted outpatient criminal forensic evaluations with male and female defendants concerning competency to stand trial, criminal responsibility, restoration to competency, and the capacity to successfully participate in a program of probation. Opinions also requested by the court included dangerousness to self or others and the need for psychiatric hospitalization.

### *Northwest Missouri Psychiatric Rehabilitation Center*

Conducted conditional release evaluations with individuals found not guilty by reason of insanity and performed initial psychological assessments with individuals judicially committed. Provided psychotherapy to individuals with a chronic mental illness, and co-led a cognitive-behavioral responsibility therapy group for individuals with Antisocial Personality Disorder and a concomitant major mental illness. Conducted research related to the prediction of success following conditional release from a forensic inpatient facility.

### Pre-doctoral Training and Experience

**United States Medical Center for Federal Prisoners**
Springfield, Missouri
Psychology Intern (APA - Approved)
September 1997 - September 1998

**Cook County Hospital**
**Ambulatory Psychiatry Clinic of Fantus Health Center**
Chicago, Illinois
Psychotherapy Extern
July 1996 - June 1997

**Cook County Department of Corrections**
Cermak Health Services
Chicago, Illinois
Diagnostic Extern
September 1995 - September 1996

**Oak Forest Psychological Services**
Oak Forest, Illinois
Therapist/Diagnostician
July 1996 - August 1997

**Bukit Ho Swee Social Service Center**
Singapore
Therapist
July 1995 - September 1995

**Movement for the Intellectually Disabled of Singapore**
Singapore
Therapist
July 1995 - September 1995

<u>Additional Academic Positions</u>

**The Chicago School of Professional Psychology**
Adjunct Faculty
January 2003 – December 2005

**Argosy University/Illinois School of Professional Psychology - Chicago Campus**
Adjunct Faculty
August 2002 – December 2002

<u>Training Workshops Provided</u> (continuing education credits awarded)

St. Antoine, T. J., Keys, A., & Fogel, M. H. (November 2010). *How to be civil with the uncivil.* Panel moderated by H. Eastman & M. Posner for the College of Labor and Employment Lawyers, ABA Section of Labor & Employment Law's CLE Conference, Chicago, Illinois. (1.5 hours)

Fogel, M. H. (April 2010). *Workplace violence and threat assessment: An overview.* Drinker, Biddle, & Reath LLP, Chicago, Illinois.

Fogel, M. H., & Zarse, N. (February 2010). *Tips and strategies for working with persons with mental illness.* Chicago Bar Foundation, Chicago, Illinois. (3 hours)

Fogel, M. H. (June 2009). *Investigative interviewing with individuals who have a mental illness.* U.S. Department of Education, Office for Civil Rights, Chicago, Illinois. (2 hours)

Fogel, M. H., & Perry, D. (July 2008). *Competency to confess I.* Summer School on Crime, Law, and Psychology, Center for Public Policy, Prague, Czech Republic.

Perry, D., & Fogel, M. H. (July 2008). *Competency to confess II.* Summer School on Crime, Law, and Psychology, Center for Public Policy, Prague, Czech Republic.

Fogel, M. H., & Perry, D. (July 2008). *Sex offender risk assessment: Practices and procedures.* Summer School on Crime, Law, and Psychology, Center for Public Policy, Prague, Czech Republic.

Perry, D., & Fogel, M. H. (July 2008). *Sex offender risk assessment: Ethical dilemmas to ponder.* Summer School on Crime, Law, and Psychology, Center for Public Policy, Prague, Czech Republic.

Fogel, M. H. (November 2006). *Forensics and supervision.* Applied Clinical Solutions, Inc., Wheaton, Illinois. (6 hours)

Fogel, M. H. (November 2006). *Psychiatric and psychological reports and terminology.* Law Office of the Cook County Public Defender, New Attorney Training, Chicago, Illinois. (1 hour)

Fogel, M. H. (November 2006). *Forensics and supervision.* Applied Clinical Solutions, Inc., Evanston, Illinois. (6 hours)

Fogel, M. H. (August 2006). *Testamentary capacity and its psychological correlates.* Levin & Schreder, Ltd. Chicago, Illinois

Fogel, M. H. (June 2006). *Navigating the judicial environment: When the therapeutic evaluator and treater becomes the testifying witness.* Catholic Charities, Lombard, Illinois.

Fogel, M. H. (November 2005). *Forensic risk assessment: Back to basics.* Association for the Treatment of Sexual Abusers, 24th Annual Conference, Salt Lake City, Utah. (4 hours)

Fogel, M. H. (September 2005). *First impressions: The client, the supervisor, the self.* Invited speaker. Illinois Psychological Association of Graduate Students Workshop, Chicago, Illinois.

Fogel, M. H. (June 2005). *Forensic mental health evaluations explained.* Law Office of the Cook County Public Defender, New Attorney Training, Chicago, Illinois. (1 hour)

Fogel, M. H. (March 2005). *Sexual deviance: Its paraphilic manifestations and the forensic setting.* Chicago Children's Advocacy Center, Chicago, Illinois. (1 hour)

### Presentations/Invited Panelist/Publications

Fogel, M. H. (2009). Violence risk assessment evaluation: Practices and procedures. In J.T. Andrade (Ed.), *Handbook of violence risk assessment and treatment: New approaches for forensic mental health professionals* (pp. 41-81). New York: Springer Publishing.

Fogel, M. H. & Schiffman, W. M. (June 2008). Forming alliance: Educating men to become allies with women. Presented at Naomi Ruth Cohen Charitable Foundation, Seventh Annual Community Conference, Women's Voices: Understanding Mental Health Issues of Women and Girls, Evanston, Illinois.

Fogel, M. H. (November 2007). *Conducting sex offender evaluations for supervising agents and housing facilities: A model approach.* Association for the Treatment of Sexual Abusers, 25th Annual Conference, San Diego, California.

Fogel, M. H. (April 2007). *Ethics of sex offender release and re-entry.* Invited panelist. Mental Health in Corrections Consortium, Offender Re-entry: Best Practice Models for Reducing Recidivism, Part II, Kansas City, Missouri.

Fogel, M. H., & Ley, R. (April 2007). *Pre-release sex offender evaluations and parole agent implementation: A model approach.* Presented at Mental Health in Corrections Consortium, Offender Re-entry: Best Practice Models for Reducing Recidivism, Part II, Kansas City, Missouri.

Fogel, M. H. (February 2007). *American Bar Association's Region 7 Client Counseling Competition.* Invited Judge. The John Marshall Law School, Center for Advocacy & Dispute Resolution, Chicago, Illinois.

Fogel, M. H. (April 2006). *Panel presentation: Three professionals discuss their role in the fight against sexual assault.* Invited panelist. The Chicago School Student Association, The Chicago School of Professional Psychology, Chicago, Illinois.

Fogel, M. H. (September 2005). *Forensic psychology: Education, training, and practice.* Invited lecturer at the University of Illinois at Chicago, Chicago, Illinois.

Fogel, M. H. (December 2004). *Evaluation and treatment of the juvenile sex offender.* Invited lecturer at the Chicago School of Professional Psychology, Chicago, Illinois.

Fogel, M. H. (November 2003). *The sexually violent person.* Invited lecturer at DePaul University, Chicago, Illinois.

Fogel, M. H. (May 2003). *Violence risk assessment: Keeping the experts on their toes.* Presented to the Chicago Bar Association, Mental Health Law Committee, Chicago, Illinois.

Fogel, M. H. (February 2003).  *Closing the gap between statute and practice: An analysis of two clinical cases and their sexual dangerousness.*  Presented at the 55th Annual Meeting of the American Academy of Forensic Sciences, Chicago, Illinois.

Fogel, M.H. (December 2002).  *Psychopathy: Havoc within a correctional setting.*  Colloquium presentation at the Chicago School of Professional Psychology, Chicago, Illinois.

Fogel, M. H. (November 2001).  *Paraphilias and the sexually dangerous person.*  Invited lecturer at Dartmouth College, Hanover, New Hampshire.

Monson, C. M., Gunnin, D. D., Fogel, M. H., & Kyle, L. L. (2001).  Stopping (or slowing) the revolving door: Factors related to NGRI acquittees' maintenance of a conditional release.  *Law and Human Behavior,* 25(3), 257-267.

# Exhibit L
# Darrick Boroczk's Letters to His Children
# (*Under Seal*)

# Exhibit M
# Certificate from In Pursuit Ministries dated May 24, 2010, and Source of Light Schools Certificate

# In Pursuit Ministries



May 24, 2010

To Whom It May Concern:

    I am writing this letter on the behalf of Derrick Boroczk. Derrick graduated our Set Free program in the Ozaukee County Jail last year 2009. He has completed the twelve-week course on addiction and received his certificate. We have continued meeting together too discuss spiritual matters concerning his life, I also have kept Derrick in our on going Set Free classes because I have found that he adds to our class and can even help others. I thank you for accepting this letter and pray that God will use it for whatever the future may hold for Mr. Boroczk.

In God's Service

Pastor Colson Leach

Pastor Colson Leach



# Bible Correspondence Course
## Certificate

Darrick Borcock

having satisfactorily completed

***My New Life in Christ 1*** is granted this certificate by Source of Light

Ministries International in recognition of this achievement on the ____ 21st

day of ____ June ____ in the year of our Lord ____

*Source of Light Schools*

General Director
SLM International

International Schools Director
SLM International

Tom Mahle
Bible School

Representative
98%

The things that thou hast heard of me among many witnesses, the same commit thou to
faithful men, who shall be able to teach others also. 2 Timothy 2:2

# Exhibit N
# Letter from Sandy Boroczk

July 26, 2011

Honorable Ronald A. Guzman
Courtroom #1219
219 S. Dearborn Street
Chicago, IL  60604

Dear Judge Guzman:

When I received a phone call on July 30, 2009, from my daughter-in-law informing me that my son, Darrick Boroczk, had been arrested and why, I cannot find the words to tell you how shocked, distraught, astounded, and deeply saddened I was and I still am to this day.  Please do not think that I am in any way attempting to minimize the magnitude of his crime, however, I would appreciate the opportunity to describe for you the son I have known for 34 years and why the charges against him seem so completely out of his character—so contrary to his morals, beliefs, and ethics, that I never would have believed him to be capable of committing such a crime.

To sum up Darrick's personality in one word, I would say "easygoing."  To sum up his attitude, I would say "positive."  I have seen firsthand that he is a hard worker, both in school and on the job.  One of his junior high teachers remarked that "he worked like a dog" in school.  Below are some examples that come to mind of the son I knew:

- When Darrick was 15, he was on his way home from school on a cold winter's day and was about to walk up the driveway to our door when he heard a faint whimpering sound coming from a couple of houses away.  He said he thought maybe a dog or cat was hurt and went to investigate.  What he discovered was our 75 year old neighbor, who lived alone, laying in the snow behind her house near the garage.  She had slipped on some ice and fell on her way to the garage, broke her hip and was unable to get up.  He told her he would get help and ran home to call 911.  Later that day, the neighbor's family came by and thanked Darrick profusely for saving their mother's life.

- When Darrick was a teenager, he would fix things that his dad couldn't quite repair, but, of course, he never told his dad.  For example, his dad had assembled a new bar-be-que grill but couldn't get the side grill to work.  The next day, while his dad was at work, Darrick reassembled the side grill and had it working.  A few days later when his dad started the grill and noticed that everything worked, he said, "I guess I did put it together right after all."  Darrick just smiled and didn't say a word.

- On the morning of 9/11/2001, it was Darrick—not my husband or best friend—who called to warn me that we may be under attack even before the second twin tower was struck by another plane.  He wanted to be sure that we were safe and knew there may be danger on my way to the office downtown.

- After Darrick had his driver's license, he never hesitated to take his grandmother to the doctor for check-ups when needed, to the store, or take her to lunch.
- Darrick was the family's "Help Desk" if a computer problem came up. There seemed to be no question he couldn't answer or problem he couldn't solve when it came to computers. He was also the person his dad and I called if we needed help with something around the house. He never hesitated to come right over, whether it was replacing a kitchen faucet, installing a lawn fountain, moving landscape rock, cleaning up and drying out a wet and soggy flooded crawlspace from time to time, fixing a computer that suddenly crashed, or helping to wrap last minute gifts on Christmas Eve.

Many times I thought how lucky I was that his teenage years went by so smoothly, unlike the turbulence I would so often hear my friends complaining about with their own children. After attending Space Camp in Huntsville, Alabama after graduating from elementary school, Darrick's first goal was to become an astronaut. However, as technology grew, by the time he entered college, he decided he wanted to build computers and eventually open a computer store. When he was in his first year of college, we took a couple of classes together and I remember that he wrote a business plan for his future computer store. But when Darrick began working, I noticed he had a positive work ethic that I rarely see in other employees. He was always honest and to the point, whether it was good news or bad. He never left a job half done -- he always did his share and more and no matter what the time, he always finished the job he was doing because he didn't like to leave a project only partially done.

Darrick was *always* someone you could depend on. He was always there for me, his dad, and his brother and sister. He was with me when his grandmother died and when his aunt died, he was at the hospital when his brother and sister were born, and he was there for their first communion and his sister's ballet recitals. He was in all respects a good son and a good brother. I never hesitated to leave him in charge of his brother and sister (now age 14) and I never saw him be anything other than caring and loving toward his own children since the day his first child came into the world. We would talk on the phone or by email almost daily and, frequently, he would ask my advice regarding baby formula, baby food, or potty training. He was like a lot of fathers — doting on their children and always wanting the best for them. A year or so after enrolling in college, Darrick landed a good job with Cardinal Health and worked for Cardinal as an Inventory Analyst full-time for seven years. Cardinal Health then closed its doors and he was instantly hired by Baxter International, since Baxter had already recognized his skills while he was still working at Cardinal. He worked at Baxter's Global Technologies Division in Buffalo Grove for almost five years up until his arrest in July 2009. Darrick was very ambitious in learning new skills and was confident that Baxter International was just the right company to work his way up the ladder. He never refused working overtime and, in fact, worked six days a week for the past few years in order to provide for his growing family. He received several letters thanking him for a job well done from some of the top people at Baxter.

Darrick was never adverse to seeking the help of a doctor when needed. In 2004, Darrick was worried that his son K██ was hyperactive and wanted to take the initiative by having K██ evaluated by a psychiatrist. He had asked me to go with him since his wife had refused even though it appeared K██ was making their lives chaotic. Darrick said he discussed bringing K██ to the doctor many times with his wife but she did not believe this was necessary even though K██'s ability to sit still, focus and listen to directions seemed to be getting worse. The psychiatrist said she believed that Kyle did, in fact, appear to have ADHD and requested that she see him again after he started school in the fall.

I never once saw Darrick look, stare or point out any children, tweens or teens or talk about them. (Before he was married, I never once saw him look, stare, point out or talk about any children, tweens, or teens.) He only seemed hungry for some adult conversation—he liked to talk about work, the new skills he was learning, possible advancement within Baxter and what did we think about it, or the latest technology capabilities—more megabytes, gigabytes, terabytes, flash drives, smart phones, ipods, satellite radio, GPS, Playstation 2, 3, Game Cube, Game Boy, and PSPs—or the newest cars, SUVs, or what that new noise was he heard in the engine of his Suzuki Trooper, or how the petri dish looked after using one of those mold testing kits, or have I seen any of his friends from high school. At other times, we would have philosophical conversations, or discuss Greek and Roman mythology, or talk about the meaning of writings of poets, or discuss various books of the Bible, or talk about theories on how the earth began, the various wars our country fought, or play one of his favorite games: Trivial Pursuit. Since Darrick took care of the kids while Candy worked most weekends, he didn't have an opportunity for conversation with other adults outside of the office except when his dad and I came to visit him.

Since the charges against Darrick seem so contrary to the beliefs and ethics of the person I knew for 34 years, I knew there must be an explanation. From the beginning I felt there were addiction issues involved—first, addiction to video gaming, then addiction to the internet, followed by addiction to adult porn and, finally, addiction to child porn. In the evening, he would search sites on every subject of interest, and he would call me to inform me of a new development in space or politics. It was when he discovered the porn sites and the ease of access, that he never saw this as an addiction that was taking hold of him and, ultimately, transformed him into someone he never wanted to be. I was very aware of the substance abusers in the family and I had warned Darrick many times about the dangers of drinking alcohol and the dangers of drug abuse, but I had never given any thought to these newer addictions that have been surfacing in the internet age. I know that Darrick never saw the computer as a source of possible addiction either.

Since I began researching internet addiction and pornography addiction, I found was a plethora of information on not only these topics which were addressed over the past several years by some of the top doctors in the U.S., but also news and information regarding men similarly situated who were first time offenders. Darrick does not have the mind of a criminal, but he does have the genes of addiction. I thought about all of the very close family members who were substance abusers, his father had a problem with alcohol abuse until he was 35; his dad's father severely abused alcohol and died at the age of 39; his half-brother who died at the age of 36. Then there is his half-brother who is addicted to pain killers after they were prescribed for a work related accident. (He died, unfortunately, from an accidental overdose five months ago.) Also, his grandfather (his father's father) who died at the age of 39 from cirrhosis due to his heavy alcohol consumption and his other grandfather and grandmother were alcoholics in addition to an aunt and uncle. While Darrick was keenly aware of the addiction problems suffered by many close family members, he was afraid of developing a substance abuse addiction himself -- but unaware that the internet could become an addiction.

In September 2009, Darrick sent a letter to me regarding this matter as follows:

"It is like being addicted to a drug. The more you do the more you need to quench the thirst of need if you will. Pretty soon you get in over your head and do stupid things to keep up your addiction or you overdose. . . I wish I would have had the courage to change the things that I needed to. Unless I didn't have the courage or strength. But I also didn't understand or acknowledge the issue either."

Then he went on to say:

"Maybe having no real friends, a loss of attraction for my wife, the complete chaos of the house I couldn't take it anymore. So I dove into the net for comfort. One thing leading to the next. Curiosity going to the next level being pulled into a world of sin. Finding the wrong people on the internet chat rooms saying or showing me various web sites. . . I couldn't break free on my own."

Darrick's letters to me bring tears to my eyes. He is so remorseful and feels so bad about what he has done that I wanted to share with you a few more excerpts:

"I love them so much. I never wanted to hurt them. But now I made my wife and kids move in with my in-laws. Pulling K████ from the school he liked and his only friend. S████████ from the school she was doing so well in and K██████was accepted into the Early Learning Program. No house and no bedroom of their own. We were almost done with S████████'s "pink room" too that she loved and like she always wanted.  The car is also gong to have to be sold as well as Candice going on welfare or some sort of State assistance. . . I was bringing in almost four grand a month at a great job and now here I am a shadow of the man I was or at least I thought I was, being more or less supported by my parents like I am a kid again."

"As far as I know, the kids think I am sick in the hospital.  Not sure what they are thinking now. Maybe that I left or died—I don't know.  That is a very, very difficult part.  I wish like hell I would have never gotten involved with it. I not only screwed up my life but my wife, my five kids, my parents and my in-laws. I tried to get out a few times, but I couldn't find the strength to ask for help. I was weak. I cannot explain how much I am sorry and regret having done what I did. Knowing what I did to everyone that I love and that love me. How can I put everyone through this like it's ok? I am in my heart not a bad person. As humans do, we made bad decisions that we don't always know how to get out of until it's too late."

"Thinking about how I have taken a lot of things for granted, sickens me. I have been completely ignorant in many ways. . . People take a lot for granted. We should all think about what we have and how easily it could be snatched away. Trust me. I know. Not due to accident or injury, but blatant ignorance and vanity. I thought I was in control of everything. While the whole time, everything I held/hold near and dear slipped away ever so slowly.  I guess it could almost or could be ranked up there like drug addiction or alcoholism."

"I am also scared to be in jail or prison and something happens to my parents or sister or brother or my kids. The hardest part of knowing this is the possibility of missing my kids growing up as well as my brother and sister."

"Being riddled with guilt about all this and how everyone I know is affected so deeply.  Living with the constant thought of what I caused to transpire, not to myself but everyone around me, that I—ME—was supposed to take care of, help, raise, and support. Now I am the one sitting here useless, supported [monetarily], unworthy."

Thank you for taking the time to read this letter and I ask for mercy in your decision. I hope that one day soon there will be regulation of the material that is available on the internet since it has been found to be highly addictive, but, in the meantime, I hope that more can be done to educate the public on the hazards of viewing pornography on the internet as well as the consequences of the eventual fall into illegal pornography so that more wives are not left alone to support children who are without a father, siblings are not left without a brother and parents not left without a son, and the state burdened by new public assistance recipients.

Sincerely,

Sandra Boroczk

# Exhibit O
# Letters from Others

March 2, 2011

Judge Ronald A. Guzman
Federal Court
219 S. Dearborn St.
Chicago, IL

Dear Judge Guzman:

I am T███ Boroczk. I am Darrick Boroczk's brother. I am very, very sorry for what my brother did. It doesn't seem like something Darrick would ever do. Our family will never be the same. Besides not seeing my brother as much as I would like to, I don't get to see my nephews and nieces like before. I think we saw each other almost every weekend.

My brother was always a nice and kindhearted person and was fun to be around. I always wished that I could see him more. I used to tell my Mom what fun it would be if Darrick was only a few years older than me so that he would live in the same house as me. We could do so many things together like play video games or play ball at the park. I still wish I could have that same fun with him again.

Darrick was my role model too. He was always nice to me and he was always nice to other people. I never saw him hurt anyone, and I never heard him say mean things to anyone. In the summer we would go swimming sometimes, or to the park, or to Kiddieland, or ride bikes or play ball out front. I felt safe with him just like I did with my mom and dad.

Darrick was always fun to be around. He would make everyone in the family laugh. He would say silly things and I think he made everyone feel happier. That's the kind of person he was. If he had a hard day at work, we never knew. When we went to his house or he came to my house, he was happy to see us and we always had fun, and usually a pizza. Our favorite was pepperoni.

He was going to teach me how to drive when I got to high school and now that's only two years away. He was going to be at my 8th grade graduation and my high school graduation and college graduation. He was going to help me with homework in high school too since my mom and dad don't remember a lot of stuff we have. We even thought about one day having our own computer business together.

A lot of people in the family have had addiction problems and what he did doesn't seem like him at all.

Yours truly,

T███ Boroczk

 M. Boroczk

June 9, 2010

The Honorable Ronald A. Guzman
Judge of the United States District Court
 for the Northern District of Illinois
Courtroom #1219
219 S. Dearborn Street
Chicago, IL 60604

**Re: 1:09-cr-00647   USA v. Boroczk**

Dear Judge Guzman,

My name is A_____ Boroczk and I am Darrick Boroczk's sister. I am writing this letter to inform you that my brother never did anything inappropriate to me. Also, he has watched over my twin brother and I as we grew up, making sure we were okay. If anything ever happened to my parents, I told my Mom that Darrick is the only person I would want to go live. He was always trustworthy and responsible. We always knew we could trust him and that he would never hurt us. I have been told that he has done some bad things that I cannot see him doing. It's just so unlike him that I just wanted to let you know of the brother that I know--the one who is a good son, a good sibling, and a good father. Besides being our brother, he was a friend. If we had any homework questions or just wanted to talk, he was always a phone call away.

Since Darrick lived about an hour away from us, my brother Trevor and I would go to Darrick's house almost every weekend during the summer and we would have a lot of fun. Sometimes we would play ball with him and his kids, and sometimes we would walk to the park, and almost every time we would have a pepperoni pizza. But each time we got together we had lots of fun, lots of silly, goofy, fun. This is what I will really, really miss.

I was looking forward to Darrick coming to my 8th grade graduation next year, and teaching me how to drive after I'm in high school. He was supposed to be there for the things that all brothers are there for. I will never know the experience of those things now with him gone. Our family's life has been turned upside down with him gone. It was so sudden. He never showed any sign of this kind of behavior. He is supposed to be there for us, but now we will never get the chance of knowing what it will be like to grow up with an older brother, just a convict on the other side of the glass.

I would appreciate any mercy the court could give my brother, even though it may look bad. There's always two sides to a story.

Sincerely,

ABoroczk



Lloyd R. Loback

Chicago, Illinois 60615

The Honorable Ronald A. Guzman
Judge of the United States District Court -
　Northern District of Illinois
Courtroom # 1219
219 S. Dearborn Street
Chicago, Illinois 60604

Re: **1:09-cr-00647　USA v. Boroczk**

　Dear Judge Guzman:

I was shocked and dismayed when I learned of the arrest, on July 2009, of my cousin Darrick Boroczk, and the serious crime of which he was accused. It seems bewilderingly out of character with the Darrick Boroczk that I know.

I was Darrick's best man at his wedding in 2000. I have visited Darrick and his family at their home during holidays. I also saw him regularly at gatherings of family and friends. At these gatherings he was always pleasant and cordial, and engaged with other adults, both relatives and friends. His younger sister and brother were always happy to see him. I never saw anything untoward in his interaction with anyone present, child or adult.

SInce Darrick's arrest, I have visited him a number of times, along with his parents and siblings. Darrick seems genuinely remorseful for his actions, and regretful for the emotional trauma and financial hardship he has caused to his wife and children. For these reasons I believe that, through counseling and therapy, Darrick can be completely rehabilitated.

Respectfully,

*Lloyd R. Loback*

Lloyd R. Loback

Nora Janes DeMoss
Martin, Tennessee
(formerly of Oak Lawn, Illinois)

October 18, 2010

The Honorable Ronald A. Guzman
Judge of the United States District Court
  for the Northern District of Illinois
Courtroom #1219
219 S. Dearborn Street
Chicago, IL  60604

Re: <u>1:09-cr-00647   USA v. Boroczk</u>

Dear Judge Guzman:

I have known Darrick Boroczk since the 9th grade.  I met him when I was a freshman at Oak Lawn High School and we have remained friends to this day.  I wanted to let you know that I could not believe the charges when I read that Darrick was arrested.  Even though I understand the enormity of the crime, I wanted to let you know that these charges are totally out of his character.  The Darrick that I knew did not express an interest in pornography or child pornography and I never even saw him express any interest in children.  He never stared at them or talked about them.  He just seemed normal.

He liked to play video games that we all played, like "Oregon Trail" and "Where's Waldo" and was interested in computers and technology.  He was fun to be around and was always responsible and dependable.

Over the past several years, we have kept in touch by an occasional email.  I do know that he had an unhappy marriage with his ever increasing family size.  Darrick and his wife had not taken a vacation since they were married or even taken the kids to the zoo.  I felt sorry for him because he seemed so unhappy and didn't know how to go about changing the circumstances, especially since his wife refused to try counseling, which he thought might help.  Then he told me last summer that they had a fifth child on the way.

Darrick was not one to play "mind" games like so many of the other kids liked to do.  He was always straightforward.  Never bossy, just plain honest.

I appreciate your taking the time to read this letter.

Very truly yours,

Nora DeMoss

Nora Janes DeMoss

ING LAM, M.D.
9611 West 165th Street, Ste. 13
Orland Park, IL 60462

Telephone: (708) 226-0661
Fax: (708) 226-0662

May 15, 2010

The Honorable Judge Ronald A. Guzman
Federal District Court Judge
Eastern Division – Dirksen United States Courthouse
Courtroom 1219
219 S. Dearborn Street
Chicago, Illinois 60604

Re: Darrick Boroczk

Dear Judge Guzman,

I am writing in response to Sandy Stevens' request for a letter for her son Darrick Boroczk, to provide statement of his character before Derrick's sentencing date.

Briefly, I had known Darrick vicariously through his son K███ who was brought in by Darrick for an evaluation on July 24, 2004, because of concerns for K███s delayed social development and hyperactivity. According to Darrick, K███ who was four years of age, was never enrolled at a pre-school at that time. Darrick attributed the lack of social interactions in a structured environment as the primary cause for the delay in K███s social development. Additionally, there was also concern regarding K███ being constantly "on the go"; as if he were driven by a motor. As an evaluator, I was struck by the unusual presentation of this case. Unlike most children who invariably arrived at the office accompanied by their mother or less frequently by both parents, K███ had arrived accompanied by his father alone. I was also struck by the disparity between Darrick's chronological vs. his emotional age. Darrick was able to set aside the anxiety and insecurity of being judged socially, and did what was in the best interest for K███. It was ironic, if not tragic, that Darrick is now being incarcerated for an offense that is so counter-intuitive to his paternal instinct as a father.

I hope this letter will help the court to view his case in the proper context.

Sincerely,

Ing Lam, M.D.

To whom it may concern:

Jarrett Adams

Honorable Judge Guzman

My name is Barbara B. Reeves, I've known Derreck for about ten yrs. He worked together in a distribution center. From the first we got along very well. Later after we had know each other better, we would talk a lot. He's a lot younger than I am. and treated him like one of my son's. He use to joke about it. How I should just adopt him.

He brought his family to my home, although I didn't go to his because of the long drive.

He always seem to me to be a honest young man. He loved his family.

He didn't cause problems at work, like some of the people. He worked hard

that didn't affect his job.
The fact is without him
the job we were doing would
not have been as easy.
His attention to detail was
something we needed.
　　Darreck and I, over lunch
and breaks, discussed everything.
When he had a problem,
we would discuss it. I tried
to give him the same advice
I would my own children.

　　　　　　Thank you for
your time
　　　　　Barbara B Reeves

April 15, 2011

Dear Judge Guzman:

I am a friend of T█████Boroczk whose brother is Darrick Boroczk. I have known T█████ and his family for 8 years and go to school with T█████. I have gone to school with T█████ and his sister since we were in first grade. I don't want to make light of any charges against him, but I thought it was important to let you know that I always thought Darrick was a really nice person and never saw him do anything wrong at any time. I saw him a lot at T█████'s house and got to know Darrick's kids too. They were all great people. I never saw Darrick do anything out of line. He was fun to be around and we laughed a lot. When he was at T█████'s house, he always helped out T█████'s mom get stuff ready for all of us kids and the grown-ups too like for birthday parties for T█████ and A█████.

I was sad to hear about Darrick's arrest and I just wanted you to know that I thought he was always a better than average brother to a better than average friend.

Sincerely,


Gabriel Masciasz
████████████████████

# Exhibit P
# Letter to Jeffrey Perconte
# from Tracy Rogers, Ph.D.



**Isaac Ray Forensic Group**
*200 S. Michigan Avenue, Suite 710*
*Chicago, Illinois 60604*
*tel: 312.212.9500 fax: 312.212.9501*

Jeffrey Perconte
Assistant U.S. Attorney
U.S. District Court
219 S. Dearborn Street
Chicago, IL 60604

July 20, 2011

Mr. Perconte:

At your request, I have been asked to review the 12/10/10 Forensic Psychological Evaluation written by defense expert Michael H. Fogel, Psy.D., ABPP, and specifically, to comment on the methods and process employed by Dr. Fogel in arriving at his conclusions, and to point out any areas of disagreement.

**1.The MMPI-2 and the PAI were the only objective measures administered in the evaluation.**
While the MMPI-2 and the PAI are the gold standards for measuring emotional functioning and personality traits, and can be clinically relevant and complimentary to formal risk assessment instruments, they offer have no predictive validity for offense behavior.

**2.The evaluation did not include any actuarial or structured clinical judgment risk assessment measures.**
Although different methodologies exist for conducting sexual offending risk assessments, the actuarial risk measures and structured clinical judgment approaches are the most widely used by those who conduct sexual offender risk assessment evaluations. Actuarial assessment measures are not designed to measure anything- they solely predict future risk. They are widely regarded as the most reliable and predictive form of risk assessment.[1] In the case of sexual offending evaluations, the risk factors predictive of sexual recidivism are identified, and the calculated score translates into a risk category of low, medium, or high. The use of statistically based models and lack of clinical judgment are strengths of this type of instrument. Relatedly, there are numerous risk assessment instruments that are objectively scored and provide probabilistic estimates of risk based on the empirical relationships between their combination of items and the outcome of interest. The probabilistic estimates indicate the percentage of people with the same score who would be expected to reoffend within a discrete period of time. Examples of actuarial instruments include the SORAG, RRASOR, Static 2002R, Risk Matrix 2000, and the MnSOST-R[2]. In the structured clinical judgment approach, decision making is assisted by guidelines that

---

[1] Bonta, A., M. Law, and R.K. Hanson, (1996). The prediction of criminal and violent recidivism among mentally disordered offenders: A meta-analysis. *Psychological Bulletin,* 123, 123-142.
[2] Sex Offender Risk Appraisal Guide (Quinsey, V.L., Harris, G.T., Rice, M.E., & Cormier, C.A., 1998); Rapid Risk Assessment of Sexual Offense Recidivism (RRASOR) (Hanson, R.K., 1997), Static-99 (Hanson, R.K., & Thornton, D. 1999); Minnesota Sex –Offender Screening Tool- Revised (Epperson, D.L., Kaul, J.D., & Hesselton, D.,1998).

have been developed in conjunction with empirical knowledge and best professional practice. The RSVP[3] is an example of such an instrument.

**3.De   viant sexual interest was not formally assessed.**

The assessment of sexual arousal (i.e., the arousal to deviant stimuli such as children) is a critical part of any sexual behavior evaluation. Deviant sexual interests and arousal as a predictor of sexual recidivism has extensive empirical support. The single strongest predictor of sexual recidivism is sexual interest in children as measured by phallometric assessment. Objective physiological assessment is best method of measuring sexual interest/arousal, both healthy and deviant, and the Penile Plethysmograph (PPG) is the gold standard of physiological assessment. It is administered in order to avoid reliance on an individual's potentially false self-report regarding his sexual interests.

**4.No opini   on was offered on whether Mr. Boroczk suffers from Pedophilia.**

According to Seto et al.[4], child pornography offenses are a diagnostic indicator of Pedophilia. Individuals who suffer from Pedophilia are at increased risk for sexual recidivism. Hanson and Bussiere (1998)[5] used meta-analysis to explore the relationship between psychiatric disorder and criminal recidivism in sexual offenders and also found that sexual interest in children, a marker for DSM-IV pedophilia, correlated strongly with sexual recidivism.

**5.Stud   ies have found that internet sex offenders have often committed contact offenses that have not been reported to law enforcement.**

While there may not be a direct causal link between viewing pornography and contact offending, the escalation model posits that individuals who view child pornography on the internet begin to normalize the images/fantasies, and thus become disinhibited, resulting in the need to seek more intense, novel content which may include contact with children. Other empirical links between the possession of child pornography and contact offenses exist in the literature. The 'Butner study'[6] found that over the course of treatment, a significant number of internet sex offenders admitted committing contact offenses that were not previously known.

Although I have not evaluated Mr. Borocz, based on all of the above considerations, most importantly Dr. Fogel's failure to use empirically-validated risk assessment measures specific to the sexual offender population, I disagree with his opinion that Mr. Borocz is low risk to commit additional sexual offenses. I do not believe that Dr. Fogel has sufficient evidence to offer an opinion on risk at this time.

Respectfully,

_____

Tracy L. Rogers, Ph.D.
Director, Sexual Behaviors Clinic

_____

[3] The Risk for Sexual Violence Protocol (Hart, S.D., Kropp, P.R., & Laws, D.R., 2003).
[4] Seto, M., Cantor, J.C., and Blanchard, R. (2006). Child pornography offenses are a valid diagnostic indicator of Pedophilia.
[5] Hanson, R.K, & Bussiere, M. T. (1998). Predicting relapse: A meta-analysis of sexual offender recidivism studies. Journal of Consulting and Clinical Psychology, 66, 348–362.
[6] Bourke, M.L. & Hernandez, A. (2009). The 'Butner Study' Redux: A report of the incidence of hands-on child victimization by child pornography offenders.

Isaac Ray Forensic Group
Licensed Clinical Psychologist, #071-007798

# Exhibit Q
# Memo by James Tibensky



# FEDERAL DEFENDER PROGRAM

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

**55 E. MONROE STREET - SUITE 2800**
**CHICAGO, ILLINOIS 60603**

**PHONE 312.621.8300**
**FAX 312.621.8399**

**CAROL A. BROOK**
EXECUTIVE DIRECTOR

**TERENCE F. MacCARTHY**
DEFENDER EMERITUS

**JOHN F. MURPHY**
DEPUTY DIRECTOR

**LOIS K. WAGNER**
ADMINISTRATIVE OFFICER

PIYUSH CHANDRA
IMANI CHIPHE
MIANGEL C. CODY
PAUL FLYNN
BETH W. GAUS
ROSALIE L. GUIMARÃES
DANIEL J. HESLER
CANDACE R. JACKSON
CHRISTINA L. F. JACKSON
MARY H. JUDGE
DANIEL G. MARTIN
DANIEL P. McLAUGHLIN
SERGIO F. RODRIGUEZ
ROBERT D. SEEDER
HELEN KIM SKINNER
WILLIAM H. THEIS

# MEMO

| | |
|---|---|
| **TO:** | Mary Judge |
| **FROM:** | James Tibensky, Mitigation Specialist |
| **DATE:** | June 13, 2011 |
| **SUBJECT:** | BOP designation information and treatment available for child pornography offenders |

---

On June 7, 2011, I spoke to Ms. Tracy Lee, a Senior Designator for the Bureau of Prisons at their central designation facility in Texas. She explained that inmates with a history of sexual offending are enrolled in the residential Sex Offender Treatment Program (SOTP-R) located in Massachusetts. This facility is a medical center with a 112-bed capacity. This program employs a wide range of cognitive-behavioral and relapse prevention techniques to treat and manage sexual offenders. This is the only federal residential treatment program and its admission is very limited.

There are seven federal prisons that offer a non-residential treatment program.

Ms. Lee said that one aspect of the Sex Offender Management Program is to manage the sex offender's *custodial* needs. The idea is that having a large number of sex offenders in one place makes them less likely to be victimized and allows for evaluation and individualized treatment.

The eight institutions with the Sex Offender Management Program are:

FCI Marianna, Florida
FCC Petersburg, Virginia

1

USP Tucson, Arizona
FMC Devens, Massachusetts
FCI Seagoville, Texas
USP Marion, Illinois
FCI Englewood, Colorado
FCI Elkton, Ohio

FMC Devens has the only residential program. Inmates are not usually designated directly to the residential treatment program. Participants are referred from other institutions after an evaluation and after the inmate agrees to participate.

On June 10, 2011, I spoke on the telephone with Dr. William Bickart, the Behavior Management Program Coordinator for the BOP. 202-514-4492. He is in the division of Psychological Services.

Dr. Bickart told me that the Sex Offender Management Program institutions all use the same treatment protocols and follow the same manuals. As is true of the Residential Drug Abuse Program, an inmate is placed in the Sex Offender Management Program at the end of the sentence so the treatment can continue through supervised release. He said they typically prefer to get the inmate to a Sex Offender Management Program institution about 36 months before release, and at least 24 months before. Until that point, the inmate is designated by management considerations rather than treatment considerations. Consequently, depending on the length of the sentence, a child pornography offender might be in custody for a significant amount of time before being eligible for the sex offender treatment program.

Dr. Bickart said that child pornography offenders are often fearful and request to be segregated from other inmates. To avoid this, they are often housed together. Occasionally they are housed at Sex Offender Management Program institutions before being eligible for treatment in order to save the transportation costs connected to moving them later.

Although, based on security levels, there may be variations in treatment the basic protocol is the same. For example, a higher security level program may also require an anger management component. The non-residential program, available at 7 of the 8 facilities, provides "moderate" treatment programs. The one residential program has the capacity for 113 inmates and is reserved for the most severe offenders and provides "intense" treatment. The attached information from the BOP website describes the difference in programs in greater detail.

2

## BOP Website Information About Sex Offender Management Programs

Inmates with a history of sexual offending are enrolled in the residential Sex Offender Treatment Program (SOTP-R) or Sex Offender Management Program (Sex Offender Management Program). The SOTP-R is an intensive, residential therapeutic program for male sex offenders in the Bureau of Prisons. This voluntary program employs a wide range of cognitive-behavioral and relapse prevention techniques to treat and manage sexual offenders. The Sex Offender Management Program is a mandatory program assignment for sex offenders who do not volunteer, or are otherwise ineligible, for the SOTP-R. The Sex Offender Management Program is designed to evaluate risk of sexual re-offense and associated management needs, and to provide and/or recommend appropriate management services during incarceration and upon release to the community.[1]

Devens

The Sex Offender Management Program is a mandatory program assignment for approximately 300 sex offenders at FMC Devens. The SOTP, an intensive residential treatment program for approximately 112 sex offenders, was established at FMC Devens in August 2007. This voluntary program employs a wide range of cognitive-behavioral and relapse prevention techniques to treat and manage sexual offenders. The primary goal of both programs is to help offenders manage their sexual deviance in order to reduce recidivism. The programs adhere to the notion that, while there is probably no permanent cure for paraphilic disorders, criminal sexual behavior can be effectively managed in most cases through competent treatment and intensive supervision. [2]

---

[1] From "Predoctoral Psychology Internship Program 2010 - 2011" offered at FMC Devens www.bop.gov/jobs/students/cpdipdev2.pdf - 2010-10-05   p 4

[2] *ibid* p 11

3